RECEIVED
in Clerk's Office

DEC 02 2021

U.S. District Court
Middle District of TN

KATHLEEN BUNT                                    )
  Pro Se Plaintiff,                            )
                                                 )
v.                                               ) Case No. **03-21 0896**
                                                 )
CLARKSVILLE MONTGOMERY COUNTY                    )
SCHOOL SYSTEM (CMCSS)                            )
  Defendant.                                   )

## COMPLAINT

    Comes the plaintiff, Kathleen Bunt, [hereinafter "plaintiff" or "Ms. Bunt"] and would show the court as follows:

    (All exhibits referred to within this Complaint are filed with Case No. 3:19-cv-01013, Kathleen Bunt v. Clarksville Montgomery County School System).

## PARTIES

1.    Plaintiff is a citizen and resident of Clarksville, Montgomery County, Tennessee and has been since 1981. Plaintiff is fifty-six years of age. At all times material, plaintiff is employed by the defendant as a Substitute Instructor filling in for absentee teachers and is in her eighth year as an employee of CMCSS and is in her tenth year substituting within CMCSS. Plaintiff holds a Bachelor of Business Administration from Austin Peay State University (1988).

2.    Clarksville Montgomery County School System [CMCSS] is a public school system organized and authorized under the laws of the State of Tennessee to provide education to the citizens of Montgomery County, Tennessee. CMCSS is one of 137 school districts in the State of Tennessee operating under the direction of the Tennessee Department of Education [TDOE]. The principle office is located at 621 Gracey Avenue, Clarksville, Tennessee 37040.

1

## JURISDICTION

3.    This court has jurisdiction pursuant to the Tennessee Human Rights Act, T.C.A. § 4-21-101 et seq., Title VII of the Civil Rights Act of 1964, the Age Discrimination Employment Act, T.C.A. § 47-50-109 Procurement of breach of contracts unlawful Damages [Acts 1907, ch. 154, § 1; Shan., § 3193a8; mod. Code 1932, § 7811; T.C.A. (orig. ed.), §§ 47-1706, 47-15-113.] and the common law of this State.

4.    Jurisdiction is proper in that the acts complained of occurred within the confines of the jurisdiction of this court.

## BACKGROUND FACTS—LEADING TO THIS COMPLAINT

5.    Plaintiff applied for a regular full time teaching position [Business Education, Career Exploration or other eligible position] in April of 2009 with the Clarksville Montgomery County School System (CMCSS) and had been waiting on an "invitation" from a hiring principal to interview for more than ten years as of December 2019.

6.    At the time of Plaintiff's application with CMCSS, in April 2009, she was employed by a non-profit organization in Nashville, Tennessee that operated and administered several education and job training programs to support the school systems in Middle Tennessee. Ms. Bunt was hired by this non-profit organization to administer the Jobs for Tennessee Graduates program (JTG) for the Tennessee Department of Education [TDOE] at Whites Creek High School (WCHS) in Nashville, Tennessee. [JTG was a state program, fully funded and under the direction of the Tennessee Department of Education] [TDOE was the "indirect" employer of the Plaintiff]. Plaintiff was a Career Specialist/Teacher instructing "at-risk" high school students in employability skills/career preparation, leadership development, civic and social awareness to prepare her students for entry into careers/workforce/military and post-secondary education. Ms. Bunt held that position for twenty-one years [August 1989-April 2010]. At the time of her hire she was twenty-four years of age. [Ms. Bunt was hired originally to administer the JTG-TDOE program at Clarksville High School (within CMCSS) from 1989-1992 and was transferred to WCHS in 1992-2010 due to funding shifts].

2

7. Ms. Bunt requested three letters of recommendation (See Exhibit 2) from her Program Manager/Supervisor, Finance Director and Executive Director of this non-profit organization and requested they be addressed directly to the CMCSS school system for her application in April 2009. Said supervisors had evaluated her job performance in these three letters, *exempli gratia*,

… "Kathleen is an excellent classroom instructor and classroom manager. Perhaps more important, she excels in building relationships with the students she teaches." "This is due, in large part, to the sincere concern she has for student success and well-being." "At PENCIL, we frequently hear from students she has taught in the past years who credit her with putting them on a positive life path."

… "She is motivated, passionate about working with young people, and is an excellent role model and trainer for younger teachers as well as for students."

… "We will be sad to lose Kathleen from the PENCIL staff but fully understand and support her desire to move into classroom instruction in Montgomery County." "We have enjoyed working with Kathleen and PENCIL is a better organization for having her on our staff."

… "Ms. Bunt exemplifies the model instructor and works diligently to prepare her students for life beyond high school." "She takes her position very seriously and works tirelessly to ensure that they have been given every advantage so they make the transition into the world of work."

… "During Kathleen's tenure at PENCIL, she has consistently been one of our top performers, assisting over 90 percent of her students to graduate each year." "She cares deeply about the organization we are a part of and the people we serve." "Truly hundreds of students' lives have been improved because of her work on their behalf." "Not only is she a masterful educator but she has excellent organization and management skills." "She is truly a motivated team player who has trained and coached novice career specialists over the years." "On top of her many work attributes, she is a kind, caring and helpful person who has a successful career in the service of others." "While we would be sad to lose her at PENCIL, our loss would be the Montgomery County School System's fortunate gain."

8. These factual quotes, from her superiors of twenty-one years, speak large volumes about Ms. Bunt's character and integrity. Ms. Bunt was dedicated to her students and made this her life's work assisting "at-risk" high school students in pursuing and achieving their career and

3

educational endeavors. Ms. Bunt commuted 110 miles round trip daily for eighteen years and decided to apply for a teaching position closer to her residence in Clarksville, Tennessee. This prompted her application to the CMCSS school system in April 2009, to end the long commute, and to continue her work in the community she resides and in the profession she loves— teaching.

9.      In April of 2010, Ms. Bunt (Caucasian) was racially discriminated against and was wrongfully terminated from this non-profit organization-JTG-TDOE program. After serving under seven Principal's during her tenure at Whites Creek High School (WCHS), a Mr. Karl Lang [African American male] was appointed as the Principal for the 2009-2010 school year of which was Ms. Bunt's twenty-first year of teaching and eighteenth year at Whites Creek High School. During his first seven months in that position, Mr. Lang interfered with Ms. Bunt's position by reporting to her supervisors falsehoods about her performance and that she was "not wanted" at WCHS. Ms. Bunt repeatedly reported to her supervisors over the seven month period that Mr. Lang's attitude toward her from the beginning of his administration was blatantly hostile. He would demean her in faculty meetings in the presence of co-workers and criticize her of "performance issues" which were never discussed with her in oral or written warnings during the seven months prior to her termination.

10.     In April 2010, Ms. Bunt was called into her employer's main office for a meeting, to her surprise, it was her termination meeting.  She was told that Mr. Lang was closing the JTG-TDOE program at WCHS. She was told by her supervisors that they (this non-profit organization) did not have any other programs to place her in. She was then told that Mr. Lang had reported to them performance issues on her part telling them she was insubordinate, refused to accept instructions from supervisors or other proper authorities, and had an inability to build positive relationships for JTG and because of this PENCIL was terminating her employment. Ms. Bunt adamantly denied all of these accusations.  Her supervisors stated to her there would be no discussions about the matter and that their decision was final. Ms. Bunt was shocked and devastated to say the least and was given no opportunity to defend herself.

4

11.    In June 2010, Plaintiff discovered through an email from a former co-worker of twenty-one years, that the JTG-TDOE program never closed and a candidate for the position was being sought. In July 2010, Ms. Bunt's position was filled by a young African American male, in his twenty's, within 90 days of her termination. Her termination was a direct result of his interference in her life and it resulted in changing it forever. Mr. Karl Lang took a serious disliking to Ms. Bunt enough to lie to destroy her teaching career, reputation and relationships with her employer of twenty-one years. All of this took place between August 2009 and April 2010—seven months to end a twenty-one year career. In August 2017, seven years later, Ms. Bunt discovered on line that Karl Lang was on this non-profit's Board of Directors during the time period prior to her termination and it became clear the amount of power he held in order to have Ms. Bunt removed from her employment of more than two decades. (See Exhibit 36).

12.    One month after her termination, in May of 2010, Plaintiff filed a Charge with the Equal Employment Opportunity Commission for wrongful termination. In July 2010, Plaintiff reported to the EEOC that an African American male had been placed in her position and that her program had never closed. (See Exhibit 6) **[Protected Activity #1]**

13.    In March of 2011, Plaintiff filed a lawsuit with the Circuit Court of Davidson County, Tennessee at Nashville. (See Exhibit 40). Plaintiff was able to rebut all of the false accusations made by Mr. Karl Lang in this lawsuit and clear her name. Everything that she was told in her termination meeting was a total fabrication in order to remove her from her position on request of Mr. Karl Lang.

14.    Plaintiff was vindicated through settlement with this non-profit organization-JTG-TDOE program in January 2014. Plaintiff signed a non-disclosure agreement with this non-profit organization- JTG-TDOE program in her settlement agreement and is putting everyone reading this complaint on notice that this information relating to this non-profit organization is to remain confidential. (See Exhibit 41).

15.    After patiently waiting for an "invitation" to interview with CMCSS, at the end of January 2012 Plaintiff applied with the CMCSS school system for office/support staff (classified positions). Plaintiff decided she would work in any position [to work in the school system] while

5

waiting on an opportunity for a regular full time teaching position (certified positions). Ms. Bunt met with Shara Sohn in the HR department to check the status of her application for the classified positions she applied for on January 14, 2012 and January 19, 2012 and Ms. Sohn, "abruptly" stated, "those positions are filled." Plaintiff stated that she found this odd."

16.    During the Charge (May 2010) and Settlement (January 2014) time period against this non-profit- JTG-TDOE program, Plaintiff decided to substitute teach until offered a regular full time teaching position or office/support staff position with CMCSS. In May 2012, Plaintiff applied and was "hired by Kelly Educational Staffing Services" on the spot, to substitute teach in the CMCSS school system. Kelly Staffing contracted with CMCSS to administer the Substitute Program for the CMCSS school system. When CMCSS ended the Substitute Program contract with Kelly Educational Staffing Services in August 2014, Ms. Bunt "transferred" to the CMCSS Substitute Program. CMCSS did not hire Ms. Bunt, as she is a "transfer substitute" along with several hundred other substitutes from Kelly Educational Staffing Services (See Exhibit 11). Plaintiff is still currently a Substitute Instructor in the CMCSS school system.

17.    In May of 2017, Plaintiff noticed a Business Education teaching position listed for Clarksville High School (CHS) on the CMCSS website. She updated her application to refresh the date in the pool of AppliTrack applicants. (See Exhibit 12) Plaintiff contacted CMCSS HR Department two days after applying and was told "abruptly" by Susan Brock, "that position is filled."

18.    Plaintiff had been pondering for a long time as to why she was not receiving any interview invitations for either the certified or classified positions she had applied for. With both HR associates reacting to her "abruptly" and both immediately stating the same thing: "the position(s) are filled," Ms. Bunt became suspicious that something was just not right. At this point in time, it had been 8 years since applying for teaching positions and 5 years since applying for office/support positions. Plaintiff's was always under the impression that her applications were in the eligible pools for selection to interview and because she had all of the email confirmations and email correspondence from CMCSS HR that showed her application to be

6

complete, up to date and active. (See Exhibits, 1a, 1b, 9a, 9b, 9c, 9d, 13a, 13b, 13c, 13d, 10 and 12).

19. While pondering the situation as to why Ms. Bunt had not received any invitations to interview in two separate and distinct departments with CMCSS, in eight years, Ms. Bunt contacted Karen Pitts, the Career Technical Education Coordinator for the CMCSS school system in May 2017 after the Clarksville High School application situation described above peaked her suspicions that something was not right with her applications. Ms. Pitts knows of Ms. Bunt through her long term substitute teaching positions that she has done for the CMCSS school system throughout a five year period. Ms. Bunt explained to Ms. Pitts about the CHS position she had just applied for and Ms. Pitts stated to Ms. Bunt, "Are you still waiting on a position, Kathleen" and "We need teachers like you." This affirmed that something was wrong in the HR department in Ms. Bunt's view when Ms. Pitts stated to her "You need to check the status of your application in HR" and "Something must be wrong." Ms. Bunt felt at that moment that something was very wrong with her application and proceeded to investigate and follow up.

20. After being disillusioned all summer, about the fact that she had not received any interview invitations in all those years, Ms. Bunt contacted the HR department on August 26, 2017. Ms. Bunt had contact with Susan Brock, Tabitha Perry, Jacob Rougemont, Melissa Perry and Shara Sohn about the status of her application through email and phone calls (See Exhibit 15).

21. On August 29, 2017, Plaintiff went to the HR department to review her certified and classified applicant files and met with Tabitha Perry (certified applications) and Shara Sohn (classified applications and substitute program files). Upon her visit, Tabitha Perry stated to Ms. Bunt, "I am unable to locate your documents." "They may have been shredded because "space is a premium." Ms. Bunt asked her, "You can't find my applicant records since April 2009 anywhere," and Ms. Perry stated, "No." Ms. Bunt asked, "Has any hiring principal/supervisor ever seen my applications/documents?" Ms. Perry shook her head, "No." Ms. Perry then stated that she would look a "couple of other places" for her records. Ms. Bunt, then met with Shara Sohn about her classified file and Ms. Sohn was unable to produce that file either. She was

7

however able to produce Plaintiff's substitute personnel file. Two missing applicant files in two separate and distinct departments.

22.     Plaintiff at this point in time decided she needed to inquire with the EEOC concerning the fact that she has not had an interview invitation in eight years with CMCSS and the fact that all of her applicant records are missing in both the certified and the classified CMCSS HR departments.

23.     On October 20, 2017 Ms. Bunt seen the opening on line for the Business Education teaching position at Northwest High School and decided to apply and put off contacting the EEOC at that point in time. On October 24, 2017, Ms. Bunt decided to "request" her first interview at Northwest High School by contacting the principal, Dr. Theresa Muckleroy, directly via email since up to this point it had been eight years with no interview invitations. (See Exhibit 48 and 49). Plaintiff was denied hire and the candidate selected was 38 years old with no teaching experience. Ms. Bunt was 52 years old, with twenty-six years of teaching experience. **[Adverse Action]** In addition, the principal, Dr. Theresa Muckleroy, during the interview, asked Ms. Bunt the question, "How old are you?"

24.     After all that occurred as provided above and then being denied hire at Northwest High School and being asked her age, **Plaintiff filed a charge with the EEOC (Charge No. 494-2018-00450) on January 10, 2018** against CMCSS for retaliation, routine destruction of her applicant records, blocking of her applications from hiring principals/supervisors and an additional charge of age discrimination for being denied hire at Northwest High School which should have been written on a separate charge as it is unrelated to the retaliation and destruction of records and blocking of application charge. The investigator neglected to do this. (See Exhibit 25 and 26). **[Protected Activity #2]**

25.     On October 17, 2019, after receiving the EEOC notice of dismissal and notice of rights (See Exhibit 23), **Plaintiff filed her Complaint with the Court** of which is the current/pending court case set for trial January 25, 2022 which includes the ADEA claims for refusal of hire for the Clarksville High School Business Education teaching position and the Northwest High

School Business Education teaching position as described above. The retaliation, records destruction and blocking of applications was dismissed because Plaintiff failed to provide sufficient evidence to show a *prima facie case* of retaliation. As stated by the Court: "In the end, Plaintiff has simply failed to set forth sufficient evidence that shows a *prima facie case* for her theory that (1) she was the victim of a purposeful scheme on the part of CMCSS to prevent her on-line AppliTrack application from being viewed and considered for open positions within CMCSS and (2) that this scheme was motivated by a retaliatory animus against her on the part to of CMCSS. It is Plaintiff's claim to prove, yet she has not deposed any current or former employee of CMCSS to uncover evidence of the alleged retaliatory scheme…" and "…Although Plaintiff has presented the Court with hundreds of pages of documentary evidence that she has attempted to piece together in support of her claim, this evidence, even when considered and viewed in the light most favorable to Plaintiff as the non-moving party, fails to raise genuine issues of material fact that require resolution at trial." **(See Docket Entry No. 62 and No. 63). (See also Case No. 3:19-cv-01013 Kathleen Bunt v. Clarksville Montgomery County School System—Final Amended Complaint for all details of this current/pending case)**

26.  Mediation for this current/pending case as described in Paragraph No. 25 took place on November 2, 2021. Plaintiff was given thirty days after mediation to file this Complaint that involves the outstanding EEOC charges listed below. Plaintiff's legal counsel Mr. Ross Pepper and the Defendant's legal counsel, Mr. Charles Cagle agreed to toll the statute of limitations until thirty days after mediation and therefore the Plaintiff has to bring this Complaint before the Court on or before December 2, 2021 or will be time barred. The Defendant, CMCSS and the Plaintiff both would like to settle with a "global" settlement with the above case (paragraph No. 25 and these EEOC charges as presented below in this new Complaint, but could not agree on a "reasonable" settlement offer (for all) and so the Plaintiff is bringing the following EEOC charges to the Court within this Complaint or be time barred.

27.  Plaintiff still wishes to settle globally and apprised her legal counsel of this. Plaintiff gave a "very reasonable" settlement offer for the current/pending case on November 24, 2021, but no response has come. At that time Plaintiff requested from her legal counsel to discuss with the Defendant to bring a "reasonable" offer to settle globally and not just an offer for the

9

current/pending case, but has not received a reply. The Plaintiff's believes the reason for no reply is because her legal counsel filed a notice of withdrawal to the Court on November 26, 2021 of which the reasons given for withdrawal were unfounded and not based in fact (See Plaintiff's Opposition to Notice of Withdrawal) and the Plaintiff is not clear as to the real reasons why the withdrawal at such an awkward stage in the process, right after mediation.

## CLAIMS OF THIS COMPLAINT AND FACTS

28.     Plaintiff's provides the following claims: (All EEOC charges are attached)

I.      **Retaliation** for Filing the January 10, 2018 EEOC Charge against CMCSS
        (Filed EEOC Charge No. 494-2019-02476 on August 26, 2019).

II.     **Age Discrimination and Retaliation** for the West Creek High School-Career
        Exploration Teaching Position
        (Filed EEOC Charge No. 494-2021-00997 on July 9, 2021)
        (EEOC stated that Plaintiff was untimely filing charge, but COVID 19/Pandemic
        interfered with the filing of this charge).

III.    **Tortious Interference with Prospective Employment Relationship Contracts via a
        Blacklist** (Filed an Inquiry with EEOC on October 14, 2021—EEOC charge
        appointment scheduled for January 4, 2022-Claim—Discovery of CMCSS's Blacklist
        with Ms. Bunt's name listed preventing her from interviewing with hiring principals
        and excluding Ms. Bunt from her preferred schools—West Creek High School and
        Kenwood High School based on false allegations that she has been substitute teaching
        at for almost ten years now and all of this is continued retaliation for filing three EEOC
        charges as described above.

29.     Plaintiff pled the age discrimination/retaliation charge and the retaliation charge filed in August 2019 and July 2021 against CMCSS (as listed above) in her Final Amended Complaint Case No. 3:19-cv-01013 (Paragraph No.'s 131-140). The EEOC charges that the following claims are based on were still pending with the EEOC when the Plaintiff filed her Complaint-Case No. 3:19-cv-01013 and therefore the Court was unable to include the them in that case which is now

10

scheduled for trial on January 25, 2022, so therefore the Plaintiff is bringing these claims in this new Complaint before the Court.

I. **Retaliation for Filing the January 10, 2018 EEOC Charge against CMCSS**
(Filed EEOC Charge No. 494-2019-02476 on August 26, 2019).

30.     Under 42 U.S.C. § 704(a), employees are protected from retaliatory materially adverse actions by their employers for engaging in a protected activity. Plaintiff employees bringing Title VII retaliation claims may seek to prove their case with indirect evidence, using a modified *McDonnell Douglas* framework. *(See Valent v. Summers, 2000 U.S. App. LEXIS 3516, at \*12 (6ht Cir. 2000).* To satisfy the first of the *McDonnel Douglas* prongs, a plaintiff alleging retaliation bears the full burden of proof of the following:

1.  She engaged in **activity protected** by Title VII
2.  The exercise of her civil rights was **known to the defendant**
3.  Thereafter, the defendant took on an employment **action adverse** to the Plaintiff
4.  There was a **causal connection between the protected activity and the adverse action.**

31.     The Plaintiff is an employee of CMCSS as a Substitute Teacher and has been since August 6, 2014, but has been substituting within CMCSS since August 2012 under her previous employer Kelly Educational Staffing Services. Plaintiff transferred into the CMCSS substitute system in August 2014 when CMCSS ended their Substitute program contract with Kelly Educational Staffing Services in order to take the program "in-house" to reduce costs.

32.     The Plaintiff is also an applicant in the CMCSS system since April 2009 for a permanent full time teaching position in her endorsement areas of Business Education, Career Exploration or any other teaching position for which she is eligible.

33.     As stated above, to show a prima facie case of retaliation, ***the Plaintiff as explained above engaged in protected activity*** by filing the EEOC charge against CMCSS on January 10, 2018 and the background facts related to that charge are described above and are also found in her Final Amended Complaint Case No. 3:19-cv-01013, Kathleen Bunt v. Clarksville Montgomery County School System. (See EEOC Charge attached—Charge No. 494-2018-00450).

11

34.     On October 17, 2019, Plaintiff filed her Complaint--Case No. 3:19-cv-01013, Kathleen Bunt v. Clarksville Montgomery County School System, with the Court. *(Protected activity).*

35.     On January 23, 2018, CMCSS received the Plaintiff's Charge of Retaliation—Charge No. 494-2018-00450. (See Exhibit 37, p. 4). *The exercise of the Plaintiff's civil rights were known to the defendant.*

36.     On January 24, 2018, the day after CMCSS received Plaintiff's EEOC charge of retaliation (for the current/pending case set for trial January 25, 2022 as described above), the Plaintiff had a slew of events that caused her to file this charge of retaliation and some of these events related directly to her employment as a substitute teacher in CMCSS. A pattern of retaliatory behavior on the part of CMCSS against the Plaintiff continued as time went of which was directly related to the filing of the January 10, 2018 EEOC charge. They are as follows:

37.     The Plaintiff was subjected to increase scrutiny during her substitute teaching in CMCSS. See Exhibit 53 which lists all of the "Principal Observation Visits" that Plaintiff had from January 24, 2018, the day after CMCSS received Plaintiffs EEOC charge through November 4, 2019. As a teacher of more than two decades, even a tenured teacher does not receive more than one or two principal observation visits within a year's time. Plaintiff received in excess of twenty-four principal observation visits, starting immediately after the filing of the EEOC charge against CMCSS, and continued for a year and a half of unannounced principal observation visits. Plaintiff is only a "substitute teacher." CMCSS does not do this with their regular full time permanent teachers. These visits would consist of the principals entering and standing and observing Plaintiff while substituting for an absent teacher. No introductions, just observation. This increased scrutiny is, according to the EEOC guidance, retaliatory in nature. (See Exhibit 51, p. 13)

38.     Plaintiff was denied interviews for the following positions that she applied for: (See Exhibit 35 and Exhibit 51, p. 13-14) **(Adverse Action).**

- College & Career—Related Arts Teacher/West Creek Middle School—October 15, 2018.
- Career Exploration Teacher—West Creek High School—March 11, 2019.
- CTE Consulting Teacher Central Services South—June 18, 2019.

39.     On May 21, 2019, Plaintiff was threatened and intimidated and dismissed from Northwest High School in the presence of class full of high school students that she was substituting for of which was her second day substituting for that same teachers classes. Mr. Smith yelled at Ms. Bunt twice stating you are dismissed and then threatened her by stating, "You are going to jeopardize your future with this district." (See Exhibit 87—Shane Smith email to Dr. Theresa Muckleroy admitting his threat to Plaintiff, but the only difference is that he wrote that Plaintiff "would be jeopardizing her future as a substitute" which is not what was said. Plaintiff wrote his exact words before leaving the classroom at the top of page 10, Exhibit 51). Plaintiff immediately reported all of this to Dr. Theresa Muckleroy in person that day as she left the school and then to her substitute supervisor, Melissa Izatt and the CMCSS CHRO, Jeanine Johnson. (See Exhibit 51, p. 1-10 Plaintiff's complaint to CMCSS HR Jeanine Johnson and Melissa Izatt-Substitute Supervisor) (See Exhibit 51, p. 26, 27 and 28 which are the response letters to Plaintiff's complaints about this threat and other retaliatory behavior that has been occurring from Melissa Izatt and Jeanine Johnson.). No investigation took place.

40.     This Assistant Principal, Shane Smith, Northwest High School happens to be the Assistant Principal under Dr. Theresa Muckleroy, Principal, Northwest High School who asked the Plaintiff "How old are you?" in her interview on October 24, 2017 and who the Plaintiff filed the January 10, 2018 EEOC charge against for age discrimination.

41.     Plaintiff was denied a long term substitute position based on false pretenses and provided this complaint to her substitute supervisor, Melissa Izatt, and the CMCSS CHRO, Jeanine Johnson on May 23, 2019. (See Exhibit 51, p. 11-21 for the complaint) (See Exhibit 51, p. 26, 27, and 28 for their response to Plaintiff's complaint). **(Adverse Action)**

42.     Plaintiff also had problems with the Substitute phone system not calling her for assignments. She would have to call the system to obtain assignments. The system would only call her when a sub assignment was cancelled. Ms. Bunt complained about this repeatedly to the substitute program office staff. (See Exhibit 51, p. 13

43. Because of all of the above listed reasons, on August 26, 2019, Plaintiff filed a retaliation charge with the EEOC—Charge No. 494-2019-02476— against CMCSS for retaliating against her for filing the EEOC charge of January 10, 2018. **(Protected Activity)**

44. Plaintiff discovered that she had been excluded from Northeast Middle School (NEMS) and Montgomery Central Middle School (MCMS) in the CMCSS EEOC Position Statement and no reasons were given. This had occurred prior to Plaintiff filing the EEOC Charge (listed in paragraph 43), she just did not discovered these exclusions until she read the CMCSS EEOC Position Statement dated October 2, 2019 (See Exhibit 16b, p. 7 and CMCSS EEOC Exhibit W-2). Plaintiff was kept out of schools in her substitute teaching job without even knowing that she had been excluded until after she filed her charge with the EEOC and made this discovery as stated above. **(Adverse Action)**

45. There was a **causal connection between the protected activity and the adverse action.** All of these retaliatory actions occurred after filing the January 10, 2018 EEOC charge. Prior to this date, the Plaintiff had been substituting and there were no instances like what has been described above. See Exhibit 82, Evaluation completed through Allison & Taylor Reference Checking Firm with Melissa Izatt, Substitute Supervisor on September 11, 2017 which rated Plaintiff very well prior to any complaints to CMCSS HR on September 25 and 26, 2017—See Exhibit 18 and the EEOC charge of January 10, 2018.

46. The Plaintiff has been kept from interviews, substitute teaching positions, excluded from schools unbeknownst to her which was ultimately blocking her from jobs in her current position as a substitute employee with CMCSS, has had extremely high increased scrutiny by CMCSS hiring principals and has been threatened concerning her future with the district as admitted by Shane Smith, Assistant Principal at NWHS (Exhibit 87) who happens to be the subordinate of the Principal, Dr. Theresa Muckleroy whom the Plaintiff filed the January 10, 2018 EEOC charge against for age discrimination of which is one of the teaching position that has made it through summary judgement in the Plaintiff's current/pending case set for trial on January 25, 2022.

47. This all involves CMCSS HR and hiring principals and the Plaintiff knows based on all of the above that she has been the victim of retaliation in many different forms repeatedly since the

filing of that EEOC charge against CMCSS. The EEOC Charge was January 10, 2018 and all of this repeatedly kept occurring throughout that year and into the next which led her to make her complaint to her supervisor Melissa Izatt and the CMCSS CHRO, Jeanine Johnson and the to file the EEOC charge of August 26, 2019 because no investigation took place about any of it. Enough was enough. Later in this Complaint, the discovery of the CMCSS "Blacklist" on October 12, 2021 ties all of this retaliation together because Plaintiff's name is on it and she was not allowed to have an interview request by hiring principal's unless the hiring principal's contacted CMCSS HR first. This is exactly why Plaintiff has been repeatedly passed over for interviews since she applied back in April of 2009 including the positions listed above in paragraph no. 38.

## II. Age Discrimination and Retaliation for the West Creek High School-Career Exploration Teaching Position
(Filed EEOC Charge No. 494-2021-00997 on July 9, 2021)

48.    A Plaintiff bringing an age discrimination claim under the ADEA must prove, by a preponderance of the evidence, that her age was the sole reason that an employer did not hire her. *(Gross v. FBL Financial Servs., Inc. 557 U.S. at 177-78).* First the Plaintiff must prove a prima facie case of age discrimination via either direct evidence, which typically requires a "smoking gun" evidence, or by indirect lines of evidence that create an inference of discrimination. *(See Bender v. Hecht's Dept. Stores, 455 F.3d. 612, 621 (6th Cir. 2006) (citing Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998)).* To prove a prima facie case via "indirect evidence," the Plaintiff bears the burden of proof in showing that:

1.    She is within the **age range** of individuals protected under ADEA.
2.    She suffered an **adverse employment action.**
3.    She **was qualified for the position** in question.
4.    **Someone younger than the Plaintiff was placed in the position** instead. (See Paragraph No. 49-50 below)

49.    On December 8, 2019, after a decade of waiting for an invitation to interview from a hiring principal and after two long letters of complaint to CMCSS HR (See Exhibit 18), two EEOC Charges as explained above (See EEOC charges attached) and the filing of the

current/pending lawsuit on October 17, 2019, the Principal of West Creek High School (WCHS) contacted Plaintiff while she was substituting at his school on December 8, 2019 to interview for the Career Exploration teaching position. Plaintiff was hesitant to interview because of the fear of denial and she expressed this in her Final Amended Complaint at Paragraphs 131-140, Case No. 3:19-cv-01013 but accepted the interview invitation, to ultimately be denied the position. (See Exhibit 77). **(Adverse Action).**

50.     The candidate that was hired was approximately **34 years old with seven years English teaching experience** (See Exhibit 44 p. 11). Ms. Bunt was **54 years old** (See Exhibit 46e-shows **birthdate** on college transcript), with **twenty-eight years of teaching experience and twenty-one of those years in Career Exploration (See Exhibit 2, 19, 46a, 46b, 46c, 46d, 46f, 46g-1, 46g-2, 46g-3, 46g-4) which makes the Plaintiff extremely qualified for the position much more so that the candidate chosen.**

51.     Plaintiff had applied for this same position six months prior, on March 11, 2019 and was denied an interview then (See Exhibit 35 and Paragraph No. 38 above). Plaintiff wrote a letter to the principal at that time inquiring as to why she was not contacted for an interview and the principal, Mr. Slight did not reply to her inquiry. (See Exhibit 51, p. 22—Letter to Mr. Slight). Ms. Bunt also inquired to Jeanine Johnson, CMCSS CHRO about the same subject and she did reply. (See Exhibit 51, p.23, 25, 28). Plaintiff believes that she was interviewed for this position for one reason and that is because she complained. CMCSS had to appear to be offering an interview in "good faith" for legal reasons only. Coincidentally, this very first "interview invitation" by the hiring principal, Matthew Slight at WCHS came less than two months "after" the Plaintiff filed her current/pending lawsuit Case No. 3:19-cv-01013 on October 17, 2019. The interview was on December 8, 2019.

52.     Age discrimination occurred again in this situation as it did in the Clarksville High School (CHS) Business Education teaching position and the Northwest High School (NWHS) Business Education teaching position of which these two positions are the ADEA claim of the Plaintiff in her current/pending lawsuit Case No. 3:19-cv-01013, that are scheduled for trial January 25, 2022 (See Docket Entry No. 62 and 63). Three times officially, Plaintiff has been

passed over for hire for individuals who have no teaching experience (CHS and NWHS) and the WCHS position, the individual has seven years teaching experience in English as compared to Plaintiff's twenty-eight years of teaching experience and of those twenty-eight years, Plaintiff has twenty-one of them in Career Exploration with the Jobs for America's Graduates program—this nation's largest school to career/college transition program for high school students (See Exhibit 46b). Plaintiff had been waiting for a decade for this opportunity and had applied for years for a teaching position. Plaintiff was exceedingly qualified for this position way over and above the selected candidate.

53.     Plaintiff discovered the candidate Ania Tinord was ultimately hired or "administratively transferred" to the Career Exploration teaching position. She was a current English teacher at West Creek High School with seven years teaching experience in English. (Plaintiff's EEOC Charge No. 494-2021-00997, states that Plaintiff was untimely filing charge, but COVID 19/Pandemic interfered with the filing of this charge. As stated in Plaintiff's EEOC charge—The Covid 19 Pandemic closed schools in March 2020 (Interview was December 8, 2019) and Plaintiff discovered a younger employee that had been hired in Career Exploration position in September 2020 when schools reopened when she returned to substitute teaching. Plaintiff completed an inquiry in December 2020 with the EEO—Charge No. 494-2021-00997 and it took until July 9, 2021 to be able to file her charge due to the pandemic and being unable to get an open appointment time scheduled).

54.     On September 13, 2021, when Plaintiff began substituting after summer break, Plaintiff discovered that she was not seeing substitute positions for West Creek High School, Kenwood High School, Montgomery Central Middle School, Northeast Middle School so she inquired through email to her substitute supervisor Erica Christmas. Erica Christmas responded a half hour later stating that I had been excluded per the principal's request for Kenwood High School and West Creek High School, but Northeast Middle School and Montgomery Central Middle school that Plaintiff provided above (being excluded—see paragraph no. 44 above) are now going to allow her to return to substituting after two years of being excluded with no reason given for the exclusion to this day for Northeast Middle School, but Montgomery Central Middle School stated that Plaintiff was excluded because of language used of which Plaintiff has waited

17

two years to determine why she was excluded. Plaintiff was excluded without her knowledge and without an investigation to determine what occurred, but what is strange is that she did not even know she had been excluded in the first place (See paragraph no. 44 above) Plaintiff has been a teacher for twenty-eight years as of 2019 and has never used inappropriate language in the presence of anyone let alone students.

55.    The Kenwood High School and West Creek High Schools have been Plaintiff preferred schools to substitute for. She earned her quality points in order to select her preferred schools and she selected these two high schools.

56.    Plaintiff's exclusion from Kenwood High School is based on false allegations made on March 3, 2021 and the Plaintiff was able to show that the allegations were false in her complaint to her substitute supervisor, Erica Christmas, but no investigation took place. Plaintiff was told in writing by her supervisor that her exclusion was temporary and that she would revisit it in the August of 2021. When Plaintiff contacted her in September 2021, she was told that the exclusion was permanent at the request of the new principal at that school. The principal that excluded Plaintiff is no longer there (Keith Parker), but now the new principal has excluded Plaintiff from the school. The new Principal Dr. James Bailey is the principal that took over at Whites Creek High School from Mr. Karl Lang who was the principal that caused Plaintiff's termination in April 2010, after twenty-one years of employment (See paragraph no. 9-13 above), another coincidence. These two principals were very much acquainted with each other because of their work as principals in Metro Nashville Public Schools, but also because of their work together to transition Dr. James Bailey into Mr. Karl Lang's position as Mr. Lang was terminated from Whites Creek High School in 2012.

57.    Plaintiff's exclusion from West Creek High School is retaliation for Plaintiff filing the EEOC Charge No. 494-2021-00997 on July 9, 2021 for age discrimination against Mr. Matthew Slight, Principal of West Creek High School. After this date, on September 13, 2021, Plaintiff discovered that she had been excluded permanently from West Creek High School by Mr. Matthew Slight, but when the school year started in Fall 2021, Mr. Slight was no longer at West Creek High School and the new principal is Ms. Damaris Luna (formerly Ms. Damaris Last—the

18

former principal from West Creek Middle School). Plaintiff had been excluded from West Creek High School permanently by this new principal of which Plaintiff substituted under for ten years and of which Ms. Luna (Last) requested her to sub in a particular position that needed a strong substitute. Plaintiff has documents of all of this to provide to the Court as evidence.

58.     For the West Creek High School exclusion Mr. Matthew Slight **knew about Plaintiff's protected activity** (EEOC Charge No. 494-2021-00997 filed on July 9, 2021) **(Protected Activity).** He was interviewed about this Career Exploration teaching position age discrimination EEOC charge after it was filed and he excluded Plaintiff from his school even because of it. Plaintiff had substituted at that school for almost a decade and she had earned quality points to earn the right to choose it as one of her preferred schools. In other words, she would be called before any other substitutes that had not earned the preferred quality points to fill in there. Plaintiff had lost many substitute job opportunities because of Mr. Slight's exclusion of her. **(Adverse Action).** There was a **causal connection between the protected activity and the adverse action because it occurred right after the EEOC charge had been filed.**

59.     On September 14, 2021, Plaintiff filed her official complaint for retaliation with her substitute supervisor, Erica Christmas, to request and investigation be conducted into the reasons for these exclusions. Ms. Christmas forwarded the complaint to the CHRO Jeanine Johnson, who contacted Plaintiff October 5, 2021 with her investigative summary. This investigative summary only included questioning of the principals that excluded the Plaintiff from these schools and it did not include Plaintiff in this investigation. The Plaintiff was never given the opportunity to refute the allegations being made against her. The allegations that the principal's made against Plaintiff are false and the Plaintiff has the evidence to prove that they are false, but has not been given the opportunity to do so by CMCSS HR.

60.     On October 14, 2021, Plaintiff filed an appeal to the Director of Schools for CMCSS, Dr. Angela Huff per the CMCSS discrimination policy. Dr. Huff returned a one page response stating that the principals that excluded Plaintiff had a "rational basis" to exclude Plaintiff from these schools, but does not provided any documentation that backs up their allegations, they are simply words not based in fact. Plaintiff is able to prove that each allegation is false, but has not been given the opportunity to be a part of the investigative process. The investigation conducted by

CMCSS CHRO, Jeanine Johnson and Director of Schools for CMCSS, Dr. Angela Huff is based solely on the words of these principals without Plaintiff's rebuttal or verifiable documentation supporting the principal's false allegations, but yet the decision was made in the appeal process by Dr. Huff, in which she "finds no evidence to support discrimination allegations." This was not an investigation, it was a one-sided, pure and simple and Plaintiff was left entirely out of the investigation. CMCSS HR either conducts no investigation or their investigation is totally one-sided (theirs), but never includes the Plaintiff in order that she may be able to refute what was being said. This has happened over and over and over again, in both of the Plaintiff's lawsuits—the current/pending case in the Court and within this newly filed Complaint.

61.     Plaintiff filed an inquiry October 14, 2021 with the EEOC to file a fourth EEOC Charge for retaliation related to these school exclusions and the CMCSS "Blacklist" she discovered on October 12, 2021 (see below for details). Plaintiff's appointment to file her charge is scheduled for January 4, 2022. This never ends and the same retaliatory behavior by CMCSS against Plaintiff continues and now it is affecting her position as a substitute instructor that she has held for almost a decade now.

62.     "Newly discovered evidence" had been presented to the Plaintiff on October 12, 2021. This "newly discovered evidence" was the reason for zero interview invitations in almost a decade with the exception of those she requested through email, NWHS and WCHS as explained above. Never did she think that she would be contacted by another individual who is suffering the same retaliation at the hands of CMCSS HR (See Exhibit 29) and this "newly discovered evidence" which is a CMCSS HR "Blacklist" is presented in the following section and amounts to Tortious Interference with Prospective Employment Relationship between Plaintiff and the hiring principal's by CMCSS HR personnel.

III.     **Tortious Interference with Prospective Employment Relationship via a Blacklist**

63.     On October 12, 2021, the Plaintiff received a text message from a Demetrius Thomas stating that he has evidence that "may be helpful" in the Plaintiff's retaliation case. Demetrius Thomas has a "retaliation complaint" identical to the Plaintiff's "retaliation complaint" against Clarksville Montgomery County School System (CMCSS) and the Plaintiff had mentioned Mr.

20

Thomas in her Final Amended Complaint to this Court. Plaintiff had read about it in the Leaf Chronicle and this is how she is aware of him (See Plaintiff Exhibit 29, p. 5-6).

64.    Both the Plaintiff and Mr. Thomas also discovered very similar issues with their applicant records not being made available when requested by them from the CMCSS Human Resource Department. Mr. Thomas had the foresight to request his applicant records through the Freedom of Information Act (FOIA). Within these documents he received from CMCSS through FOIA, Mr. Thomas discovered, what the Plaintiff is referring to in this document, as the "newly discovered evidence"—which is a list of ten CMCSS applicants and it appears to be a "blacklist."(See attached-labeled as Exhibit H-Demetrius B. Thomas v. Clarksville Montgomery County School System, Charge No. 494-2018-00305). This list appears to be a "blacklist" based on the comments on it and the explanation and evidence provided below.

65..    As described to the Plaintiff by Mr. Thomas, this "blacklist," was provided by him, to the EEOC and later to his attorney, Stephanie Mize and was submitted as evidence in support of his "retaliation complaint" to Judge Eli J. Richardson's Court per Mr. Thomas. When Mr. Thomas had contacted the Plaintiff, he did this via Facebook messenger because he did not know how to get in touch with Ms. Bunt. He requested that the Plaintiff call him about this "newly discovered evidence" that it would be helpful to her case.

66.    When the Plaintiff called him, he provided many details that were strikingly similar to the Plaintiff's case. He also explained that he was informed about the Plaintiff's case because a family member had come across the Plaintiff's court case online and immediately told Mr. Thomas that their two cases were identical in nature and that this was something he needed to read about. Mr. Thomas at this point was taken back, by the name "Kathleen Bunt." He explained to the Plaintiff that when he seen her name on the case information (Plaintiff's court case) that the family member had given him, he immediately remembered being questioned about "Kathleen Bunt" in his deposition given by CMCSS's attorney at the time, now resigned, Kaya Grace Porter. He told the Plaintiff that he remembered that at his deposition Kaya Grace Porter asked him, "Do you know Kathleen Bunt?" He replied that the name seemed familiar, but he could not say how he knew of Kathleen Bunt's name.

21

67.    When he received the Plaintiff's case information from his family member, he tied it all together and it "jogged" his memory and at that time he realized that where he had seen Kathleen Bunt's name before and could not remember in his deposition was on this "blacklist," along with his name and eight other individuals. Mr. Thomas immediately made efforts to provide the Plaintiff with a copy of this "blacklist." The Plaintiff is now providing a copy of this "blacklist" to the Court in support of her retaliation complaints." (See attached Exhibit H--labeled as Exhibit H-Demetrius B. Thomas v. Clarksville Montgomery County School System, Charge No. 494-2018-00305).

68.    One of the most striking things about this "blacklist" is that both of the Plaintiff's and Mr. Thomas's names appear on this list which provides another commonality about them and lends great support to both of their retaliation complaints. The question must be asked: Why is both Demetrius Thomas and Kathleen Bunt listed on a list that states, "Must contact HR prior to interview request?" The list has this as headings on two of the columns of information as you will see when reviewing it. The list also, in capital letters, emphasized, "CONTACT HR" next to every name on that list. This list was created by CMCSS HR and is provided directly to school system principals so that when they are selecting candidates they will know which applicants are not to be called for an interview, but instead are to call HR.

69.    The last column on the list, labeled "comment" provides the "credentials or endorsement areas" for most candidates and then it provides various "notes" that appear negative in nature, like "poor references," or "non-renewed at CMCSS 5/2015," or "check with HR before moving forward," or "Prior non-renewal 16-17," etc.. Mr. Thomas's notes were "whited out" but the notes that were provided to him anonymously that led to his lawsuit that are explained in Exhibit 29-Leaf Chronicle article and are believed to be the notes that were on this list prior to his request for documents through the Freedom of Information Act. They are similar to other notes for other applicants on this list.

70.    The "anonymous notes" that were provided to him by someone in CMCSS's HR office as reported in the Leaf Chronicle article are very characteristic of the type of notes on this list. Mr.

Thomas informed the Plaintiff that these notes are on his application that he received with the documents that he was able to retrieve through FOIA. He also stated that he has the Plaintiff's applicant records of which was striking also because CMCSS HR was unable to provide any of the Plaintiff's applicant records to her. The Plaintiff's notes say, "Please contact HR." Why and what is it that CMCSS HR has to say to a hiring principal about her when they tout they are "NOT" involved in the selection, interviewing or hiring of candidates for teaching positions. Why can't the principals have their "autonomy" as they also tout, and be able to pick up the phone and contact Ms. Bunt without having to speak to CMCSS HR? (More about this below).

71.     There is also a redacted version of this list that CMCSS provided to the EEOC, and Mr. Thomas is working to get a copy of this from his attorney to provide to the Plaintiff. There is also a copy of this same "Blacklist" that has both Plaintiff's and Mr. Thomas's last names on them of which Mr. Thomas is working to get a copy for the Plaintiff of this also. All of these documents should be a part of Demetrius Thomas's case on file in Judge Eli J. Richardson's Court, Case No. 3:19-cv-00956.

72.     For now, merely because of its existence, this list that the Plaintiff is providing to this Court is sufficient, even without the candidates last names, because the information provided matches the Plaintiff's application position and date submitted (See Plaintiff Exhibit 27 or 35 p. 3)) and her teaching endorsements-Job Embedded Business with TSU (See Plaintiff Exhibit 19 p. 10-11).

73.     It is now very clear as to why the Plaintiff has never had one interview in a matter of a decade, but had to request her first after waiting until October 2017, of which is more than eight years since she submitted her application in April 2009 and a month after her complaints to CMCSS HR. The second interview was in December 2019, of which coincidentally, was two months after she filed this lawsuit on October 17, 2019.

74.     The mere fact that there is a "List" with both the Plaintiff's and Demetrius Thomas's name's on it and both have retaliation complaints of blocking applications and preventing interviews at the very same time with the United States District Court--Middle District of

Tennessee is not a coincidence. This "blacklist" is a list provided to the hiring principals by CMCSS HR and every name that is listed on it cannot have an interview with any particular principal until that principal contacts CMCSS Human Resources—hence the "headings" "Must contact HR prior to interview request" of which this is stated twice on the list. There is also the column that states, "CONTACT HR" ten times, one for each of the individuals that are listed on this "blacklist" and are capitalized as if to "emphasize" this requirement. This list is extremely concerning to the Plaintiff and Mr. Thomas that there are eight other individuals on this list other than ourselves that have no idea, to our knowledge, that there name is on such a list.

75.     The Plaintiff has corroborating evidence that this list is definitely a "blacklist" and she has submitted that corroborating evidence to this Court in her exhibits and also cited them throughout this document. She has also attached a copy of this corroborating evidence with the "blacklist" for the Courts easy review. (See email attached from Jeanine Johnson to Kathleen Bunt dated May 20, 2019—which is Plaintiff's Exhibit 51, p. 25 and also see Exhibit A of the Affidavit of Jeanine Johnson). This corroborating email demonstrates that this is a "blacklist" per Jeanine Johnson's statement in this email to Ms. Bunt:

> "First let me explain that **Human Resources personnel are *"not involved" in the interviewing and selection of teachers for placement at schools.*** When a vacant teaching position is posted and an eligible candidate applies, *the principals, as the hiring supervisors, select who they want to interview* from the eligible candidates. *Once the principal completes the interviews, he/she makes the hiring decision.* The principal is in the best position to know the staffing needs of his/her specific school."

76.     Jeanine Johnson states emphatically that "CMCSS Human Resources personnel are "NOT" involved with the interviewing and selection of teachers for placement at schools, but yet the "blacklist" states clearly to hiring principals, *"Must contact HR prior to interview request"* as explained earlier, and that is emphasized all over this list as can be seen very readily. This leads to the question once again--Why is the Plaintiff's name on such a list with CMCSS? What does CMCSS HR need to discuss with the hiring principals before she be requested for an interview by a hiring principal? This alone means that there is something going on in the

24

background, by CMCSS HR personnel that has kept the Plaintiff from being interviewed because Plaintiff has never had an interview where she did not make some effort herself to request one such as the NWHS Business Education teaching position (See Exhibit 48—Letter to Dr. Muckleroy, Principal from Kathleen Bunt-request interview) and the WCHS Career Exploration teaching position (See Exhibit 51, p. 22—Letter to Mr. Slight, Principal inquiring as to why no interview request).

77.    It is very clear that CMCSS HR has to discuss information with any principal before they can contact Plaintiff for an interview which provides "direct evidence" as to why she had not had any interview requests in all of these many years as explained above. It also provides an extremely strong inference that there is something negative that HR has to talk to these principal's about concerning Ms. Bunt and the others listed because the mere fact of the lack of interviews demonstrates this point. What does HR have to discuss with these principals before the Plaintiff can have an interview—because remember— Jeanine Johnson and HR personnel, as explained above, "CMCSS HR has "NOTHING" to do with the "interviewing, selection or hiring of teachers for placement at schools."

78.    Why are there ten names on that list of all the hundreds of applicants in their system that principals have to CONTACT HR before they can request an interview? Why is the list not filled with the hundreds of other applicants stating next to their names, "Must contact HR prior to interview request," but yet there are only ten names singled out—this is disparate treatment by CMCSS at least in the cases of Kathleen Bunt and Demetrius Thomas.

79.    There is absolutely nothing else in Ms. Bunt's background that could possibly land her on a "blacklist"—No bankruptcies, no credit issues, no divorces, no criminal record, no issues of any kind—except that one issue with her former employer of which has connections in the Tennessee School system, the same as CMCSS as per the Plaintiffs Final Amended Complaint. The Plaintiff has filed three EEOC charges also after the January 10, 2018 first charge and has been kept from interviews as explained above (See Paragraph No. 38 above). CMCSS completed a background check on the Plaintiff for her substitute position when she transferred from her employer Kelly Educational Staffing Services in August 2014, and because the Plaintiff has been

working in the substitute program for almost ten years now, it shows that there was nothing on her record to warrant being put on a "blacklist" by CMCSS.

80.     The information that the Plaintiff has provided within this document should lend serious credence to the fact that there was a "scheme" on the part of CMCSS in the form of a "blacklist" to keep certain individuals from obtaining employment within CMCSS including the Plaintiff. This shows that an "adverse action" had been taken against the Plaintiff—denial of employment by way of "blacklisting" her. This "blacklists" very existence is extremely troubling to the Plaintiff. If there is this one then there is more. The lack of interviews for more than a decade is evidence that corroborates that their "blacklist" served its purpose.

81,     Ms. Bunt's "theory" was correct—there was nefarious behavior taking place against her by CMCSS, but she just did not have the "direct evidence" to prove that animus and retaliatory behavior was taking place by CMCSS against her until now. The very existence of Ms. Bunt's name being on a "blacklist" is discrimination on its own and is of the retaliatory nature.

82.     This is exactly what CMCSS HR has done to Kathleen Bunt. The Plaintiff is an employee of CMCSS in the capacity of a substitute teacher for almost ten years and she is also an applicant in the CMCSS system for a permanent teaching position for almost twelve years now. CMCSS HR has no legal reason to place her name on a "list" of any kind that is provided to hiring principals that tells them that they **"Must contact HR prior to requesting an interview."** There is no reason whatsoever that HR should be involved in the interviewing, selection and hiring process between the hiring principals and Ms. Bunt and this is according to their own words as described above (See Paragraph No. 75) (See attached May 20, 2019 email from Jeanine Johnson to Kathleen Bunt) (See Exhibit 51, p. 25) and provided in even more detail below.

83.     How far reaching has this "blacklist gone? How much damage has it caused the Plaintiff's reputation in the teaching field or any field for that matter? How many individuals that are in charge of hiring have viewed this list? Who has viewed this list in addition to these hiring principals and CMCSS HR personnel? How many times is a new list generated by CMCSS HR?

These are the questions that Ms. Bunt has and rightfully so, and she is devastated by such shocking, outrageous and egregious behavior on the part of CMCSS HR personnel that has prevented Ms. Bunt from a permanent full time teaching position with CMCSS for twelve years now and is even more shocked and appalled at the fact that this deception has carried on so long even up until the present date and all along this "blacklist" was out there.

84.   For a school system to have such a list that requires hiring principals to have to check with HR before they can request interviews, in this case, from a select group of ten people, but yet have told the EEOC, the Court and the Plaintiff that CMCSS HR is *"not involved in the interviewing, selection or hiring of candidates."* This is absolutely shocking to witness that something like this is possible, but yet there it is in black and white—a "blacklist" with Kathleen Bunt's name on it. But, this is not all, because their deception to this Court was not just in the one email document as quoted above and attached, that corroborates this list as a "blacklist" but several other documents and more serious documents such as the Affidavits of Jeanine Johnson and Melissa Izatt—also attached as explained below.

85.   With this said, the Plaintiff needed this information to provide to the Court during summary judgment, and the entire time Charles Cagle and Kaya Grace Porter had this "blacklist" in their possession when dealing with Demetrius Thomas's case. They received it during discovery from Demetrius Thomas and his attorney Stephanie Mize. They even deposed Mr. Thomas inquiring if he knew "Kathleen Bunt" as stated above.

86.   Kaya Grace Porter (now resigned) and Charles Cagle, represent CMCSS against both Demetrius Thomas and Kathleen Bunt. They had this "blacklist" in their possession with Kathleen Bunt's name on it and did not disclose this fact in their Motion for Summary Judgment or to the Court at any time, but instead submitted the Affidavits of Jeanine Johnson and Melissa Izatt that provided false information about CMCSS's selection, interviewing and hiring process. CMCSS HR say they are not involved in the interview and selection (or hiring) process in the documents as cited above and in the cited documents below, but the "blacklist" says differently which provides "direct evidence" to this Court of their deception that they are involved in the selection and interview (and hiring) process, but only with a "select few" including the Plaintiff.

If they would deceive the Court this way, then what else have they deceived the Court about? Continued retaliation against the Plaintiff has been occurring all this time and she has had to file additional charges with the EEOC because of it and now this new Complaint/lawsuit.

87.    Also Charles Cagle and Kaya Grace Porter took advantage of the fact that the Plaintiff is Pro Se and took it upon themselves to block her out of discovery, by stating she was untimely with her discovery. This was the time that they should have disclosed any list that Kathleen Bunt's name appeared on, but instead got out of it by claiming untimeliness. Docket Entry No. 53, p. 6 states, "The Court finds, first, that the Magistrate Judge clearly erred in concluding that the Plaintiff's discovery requests were untimely." So this definitely shows that the Plaintiff was timely on her discovery requests, and therefore everything else that was deemed untimely that came after this point including her good faith letter to the Defendant and her motion to compel was unnecessary. Clearly, the Plaintiff was blocked from the discovery process entirely. They simply saw the Plaintiff as a Pro Se litigant and decided to do whatever they wished without regard to the rules of the Court.

88.    The following is a list of quotes directly from Jeanine Johnson and Melissa Izatt's Affidavits that have been submitted to the Court that demonstrates "direct evidence" that CMCSS HR personnel made false statements to the Court in their own sworn Affidavits that they are not involved in the selection, interviewing or hiring of candidates/applicants, but yet the "Blacklist" shows differently, that they are involved, at least with ten candidates/applicants, including Plaintiff that are on the list. Charles Cagle and Kaya Grace Porter knew about this and filed these Affidavits anyway. The following statements confirm this deception:

- **Affidavit of Jeanine Johnson states at ¶ 32:**

"I explained to Ms. Bunt via email that process used by school administrators to hire teacher for their specific buildings. The *process allows administrators (principals) the autonomy to hire teachers* based on their specific needs at their school. CMCSS has objective, established procedures in place that *administrators follow when selecting qualified teachers* who best fit the needs of a specific school. (See Exhibit A-Affidavit of Jeanine Johnson)."

28

- **Affidavit of Jeanine Johnson states at ¶ 33:**

"*The HR Department is not involved in the interviewing and selection of teachers for placement at schools.* When a vacant teaching position is posted and an eligible candidate applies, *the principal, as the hiring supervisor, selects who they want to interview from the eligible candidates.* Once the *principal completes the interview he/she makes the hiring decision.* The principal is in the best position to know the staffing needs of his/her specific school." (See Exhibit A-Affidavit of Jeanine Johnson)

- **Affidavit of Jeanine Johnson states at ¶ 27 and ¶ 28:**

"The CMCSS HR Department annually trains it principals on hiring practices." And "The CMCSS HR Department is aware of and follows U.S. EEOC laws."

> *(CMCSS does not follow EEOC laws because the EEOC considers "blacklisting" something that is worthy of complaint because this is illegal especially when discrimination is involved and in the Plaintiff's case it is. Also, if CMCSS annually trains principals on hiring practices, did they train them on the fact that "blacklists" are illegal? Since the principals are viewing the "blacklist" and following what CMCSS HR has stated, "Must contact HR prior to interview requests" then they are participating in an illegal discriminatory process, as much as CMCSS HR is. Just knowing about the Blacklist, participating in it and doing nothing makes the hiring principals just as culpable as CMCSS HR.) .)(Jeanine Johnson is the CHRO of CMCSS and is also the Title VI Coordinator who is in charge of handling any discrimination claims that come through that office. She should know that blacklisting" is a violation of EEOC laws. If Ms. Johnson has been deceptive about this, then what else has she been deceptive about? This puts her credibility in question).*

- **Affidavit of Jeanine Johnson states at ¶ 20:**

"I prepared and sent Ms. Bunt an email dated 9/26/2017, and I reminded her that principals determine which candidates to interview." (See Exhibit A-Affidavit of Jeanine Johnson)

- **Affidavit of Melissa Izatt states at ¶ 26:**

"When an applicant completes an application and meets position requirements, the application is approved, and the candidate is eligible for an interview. However, *principals have the autonomy of selecting candidates to interview.*"

89.     All of the quotes within these Affidavits and the email attached sent from Jeanine Johnson to Kathleen Bunt on May 20, 2019 demonstrates that CMCSS HR are not involved in the "prospective employment relationship" between hiring principals and candidates for teaching positions and this is repeated over and over again. CMCSS HR personnel are "third parties" to this "prospective employment relationship" and have "no legal justification" for requiring hiring principals to contact CMCSS HR personnel before allowing the ten individuals listed on the "blacklist" to interview and be hired. Those ten individuals on the "list" were candidates/applicants that were deemed "eligible and qualified" for an interview/hire by CMCSS HR personnel and were determined to be "eligible and qualified" to be selected for hire. But for the actions of CMCSS HR personnel creating this "list" and placing their names on it and distributing it to hiring officials/principals, their actions caused a "parting of ways" or split (breach) in this "prospective employment relationship" between the hiring officials/principals and these candidates/applicants, including Ms. Bunt. In other words, the "potential for hire" was there, but CMCSS HR personnel's "interference" induced a breach between hiring officials/principals and the candidates/applicants on this list, including Ms. Bunt. This is tortious interference in addition to disparate treatment of ten candidates among hundreds with absolutely "no legal justification" whatsoever for it.

90.     "A claim for intentional interference can be brought only against a person or entity who was not a party to the contract." *https://www.nashvillebusinesslitigationlawyersblog.com/ proving-intentional-interferen/.* CMCSS HR personnel were not a party to this "prospective employment relationship" between the hiring officials/principals and the candidates/applicants and this is expressed over and over again, their own words, sworn under penalty of perjury, as quoted above and reiterated here:

> "*The HR Department is not involved in the interviewing and selection of teachers for placement at schools.* When a vacant teaching position is posted and an *eligible candidate applies, the principal, as the hiring supervisor, selects who they want to interview from the eligible candidates.* Once the *principal completes the interview he/she makes the hiring decision.* The principal is in the best position to know the staffing needs of his/her specific school." (See Exhibit A-Affidavit of Jeanine Johnson ¶ 33)

30

91. *CMCSS HR personnel knew about these ten candidates/applicants "prospective employment relationship"* with the hiring principals because they placed their names on a "list" that required the hiring principals to "CONTACT HR" before allowing interview requests. "Under Tennessee law, the plaintiff does not have to prove that the defendant had actual knowledge of the specific terms of the contract (prospective employment relationship) which were breached. Where plaintiffs have proven merely that the defendant knew of the contract (prospective employment relationship), *Tennessee courts have found that the defendant had a "duty to learn whether its actions would have caused a breach (parting of the ways)" of the terms of the contract (prospective employment relationship).* A Tennessee case discussing this element is *Wells Fund I v. The Shoe Show of Rocky Mount, Inc. (Tenn. Ct. App. 1993)."* *https://www.nashvillebusinesslitigationlawyersblog.com/Proving-intentional-interferen/* "Existence of a legal contract does not necessarily have to be in writing as most contracts in Tennessee can be verbal and still be enforceable."*https:www.nashvillebusinesslitigationlawyers Blog.com/proving-intentional-interferen/*

92. The Defendant intended to interfere with these "prospective employment relationships" including Ms. Bunt's of which is witnessed in the "creation and the distribution of such a list by CMCSS HR personnel to hiring principals." By simply knowing that this "list" was created and keeping it "secret" and was provided to hiring principals for the simple reason to "block" interviews and therefore "block" hire of those on the list, including the Plaintiff, was malicious in that it's intent was to prevent these individuals from obtaining employment and securing a livelihood that is required to sustain life.

93. *"To prove knowledge and malicious intent, all a plaintiff must prove is that the defendant intentionally acted to do something for which there was no legal justification."* "What does that mean? As Tennessee case law bears out, all it means is that the defendant intentionally did an act that it knew would benefit it at the expense of the plaintiff. The term "malicious intent," at least as used in intentional interference cases, is archaic, confusing and unfortunate. Even lawyers can easily assume that, to prove malicious intent in an intentional interference case, a plaintiff must prove that the defendant engaged in the act to hurt the plaintiff and/or had ill will. The reality is that the malice element can easily be met by a plaintiff even if

31

the defendant acted strictly for its own financial gain without giving one bit of conscious thought as to whether its act would hurt the plaintiff." *See, Crye-Leike Realtors, Inc. v. WDM, Inc. (Tenn. Ct. App. 1998). https://www.nashvillebusinesslitigationlawyersblog.com/proving-intentional-interferen/*

94.     The statements/quotes listed above from the Affidavits of Jeanine Johnson and Melissa Izatt state very clearly, in one form or another that ***CMCSS HR "are not involved in the interviewing, selection or hiring of candidates,"*** as they have informed the Court under "penalty of perjury" in their Affidavits as cited above, but yet this "blacklist" states that they have inserted themselves into the process by requiring the hiring principals to "CONTACT HR" prior to requesting an interview of anyone on that list including Kathleen Bunt. In Ms. Bunt's case, this "blacklist" has succeeded in preventing interviews of which Ms. Bunt has had no interview invitations by hiring principals in over a decade. As discussed in this complaint the two interviews that she did have, she wrote directly to the hiring principals via email and still was refused hire of which the NWHS position is part of Ms. Bunt's ADEA claim in her current/pending case and will proceed to trial. The WCHS position is the position that is part of this current Compliant—(see above). (See Exhibit 48—letter/email to Theresa Muckleroy, Principal at Northwest High School and Exhibit 51, p. 22—letter/email to Matthew Slight, Principal at West Creek High School).

95.     CMCSS cannot say over and over again, as provided above, in these Affidavits, that they have no role in the interviewing and selection/hiring process. The "blacklist" clearly shows different." CMCSS HR states several times that throughout their documents to the Court that "principals are given autonomy" in the interviewing and selection process (meaning independence separate from CMCSS HR) of which is another very false statement as the "blacklist" shows that certain individuals including the Plaintiff, are not allowed an interview unless CMCSS HR is contacted and made a part of the process at their "interfering" request. As we know the Plaintiff has not been called for an interview in a period of many years. This is not "autonomy," this is CMCSS HR personnel tortuously interfering with this "prospective employment relationships" repeatedly as demonstrated in the repeated lack of interview invitations to the Plaintiff by hiring officials/principals in over a decade.

96.     "The plaintiff must prove, at the very least, that some act of the defendant caused or contributed to the decision to breach (part ways) the contract (prospective employment relationship) with the plaintiff. The act could be inducement, persuasion, misrepresentation *or any other act, however characterized, that caused or contributed to the breach (divide between the hiring officials and the prospective candidates for hire).*" CMCSS's actions to create and distribute a "list" that prevented eligible candidates for interviews was the proximate cause of the divide between the hiring officials/principals and the candidates for interview/hire. It clearly interfered with the free will and autonomy of the hiring officials/principals to select "any" candidate for interview/hire that they chose without input from CMCSS HR personnel. (As per their own words as quoted above via their Affidavits to this Court). Because of this action, by CMCSS HR personnel in creating such a list and distributing it to hiring officials/principals, the candidates on this list, including Ms. Bunt were prevented from a "fair" opportunity for hire, without any interference in the process and therefore lost out on the opportunity to obtain employment in the field or position of their choosing and therefore affected/damaged these candidates/applicants personal and financial futures in a very adverse way.
*https://www.nashvillebusinesslitigationlawyersblog.com/proving-intentional-interferen/*

97.     In addition, Kaya Grace Porter and Charles Cagle, CMCSS's attorneys knew about the "blacklist" with Kathleen Bunt's name on it, during discovery in the Plaintiff's case as well as Demetrius Thomas's case of which the Affidavits of Jeanine Johnson and Melissa Izatt were dated July 2, 2020 and July 6, 2020, respectively. They had a duty to this Court to present truthful information in these Affidavits, but instead misled this Court on the selection, interviewing and hiring process over and over again, knowing far well that this "Blacklist" existed and that CMCSS HR personnel were very much involved in the selection, interviewing and hiring process of these ten candidates on the list in order to keep a select few out of employment with CMCSS. In addition, CMCSS HR personnel required their own hiring principals all over the district to go along with this scheme by utilizing a "blacklist" as it was provided to all of them by CMCSS HR. The question now is how many times has this happened to other candidates/applicants, in addition to Ms. Bunt, Demetrius Thomas and the eight others

33

on this list throughout the years, and how many reputations and financial futures have CMCSS damaged in the process? What is the fall out for all of these individuals?

98.     Ms. Bunt knows the fall out in her case and it is very devastating and disheartening to say the least. There are "over 800" substitutes teachers that have been hired in certified (teaching positions) and classified (office/staff positions) since August 2014 (See Plaintiff Exhibit 8) and not one of them was the Plaintiff. This should also corroborate the fact that this list is a "blacklist" otherwise the Plaintiff would have had at least one interview invitation from a hiring official/principal in over a decade as of this date and most likely would be hired and working in her profession of choice—teaching. She would not have seen more than a decade pass of which she cannot get back. The worst part of this is not knowing what is being said or done behind her back that is damaging to their life.

99.     The following are other documents/evidence that CMCSS HR has reported that they are "NOT" involved in the selection, interviewing and hiring of teacher candidates:
        Exhibit 13e/Exhibit 18, p. 7 and 15/Exhibit 51, p. 28

100.    CMCSS might come back with a defense that their policies have changed and have lists for whatever reason, but the Exhibits and Affidavits as explained above, from CMCSS HR personnel to Ms. Bunt show that this hiring process from August 2014 through to the current time has not changed, but stayed steadfast in to fact that "CMCSS HR personnel are "NOT" involved in the interviewing, selection and hiring of teacher candidates, only the principals are, with one exception, those listed on the "blacklist." There is no legal justification for any type of list such as this one.

101.    CMCSS HR are only involved with the processing of applications and after the principals have selected, interviewed and hired an applicant, then CMCSS HR is involved in the processing of the paperwork as a new employee, period. There should be absolutely no reason to have to have the hiring principals to contact HR prior to requesting an interview, if this is the case then this must be done on all applicants, all the time. (The following exhibits prove the hiring process has not changed, in all of these years--Exhibit 13e, Exhibit 18, p. 7 and 15, Exhibit 51, p. 28,

34

Affidavit of Melissa Izatt at ¶ 26 and Affidavit of Jeanine Johnson at ¶¶ 20, 27, 28, 32, 33, and 34).

102.    In Plaintiff's current/pending case before the Court that will proceed to trial on January 25, 2022, the following information was provided in the Defendant's motion for summary judgement that portrays Ms. Bunt as "imagining" or "making up" a theory that there was a scheme against her employment applications.

An example of this by the Defendant **Docket Entry No. 61,** states:
> "CMCSS understands that Plaintiff is Pro Se; however, Plaintiff's language has become increasingly strong over the course of this matter. Plaintiff's "proof" has not done the same. Plaintiff suggests illicit intent on the part of a Tennessee school system (Doc. 56 at p. 31), going so far as to allege that CMCSS "contrived and concocted" reasons not to place Ms. Bunt in her preferred teaching role within the School System. *Id. at p. 55.* CMCSS makes this point only to underscore its belief that, because Ms. Bunt imagines and maintains that the School System has egregiously wronged her, even marginally more authentic amount of evidence would follow such strong claims."
>> *(In response to this, Kathleen Bunt was not wrong about any of her belief that CMCSS had "illicit intent" against her and her name being on the "blacklist" proves it and everything that is described above corroborates this fact. CMCSS is not innocent just because they are "a Tennessee school system." There are HR personnel who are engaging in tortious interference/discriminatory practices against the Plaintiff by way of this "blacklist.")*

The Defendant's **Docket Entry No. 52 states:**
> "Plaintiff fails to offer significant probative evidence that alleged discrimination was pretextual. Plaintiff's Response fails to include an illustration of how CMCSS's hiring decisions were pretextual, assuming that Plaintiff has a prima facie case and that she could show that the legitimate, non-discriminatory reasons offered by Clarksville Montgomery County School System are false."

*(In response to this, because of the discovery of this "blacklist" of which is "significant probative evidence," and all of the corroborating evidence that goes with it as described above, demonstrates or "illustrates" that everything that CMCSS reported about their hiring process and decisions were/are all a cover up, or "pretext" for their real reasons—retaliation against Ms. Bunt and tortious interference to keep her out of permanent full time employment with CMCSS by way of this "blacklist" and it seems to have worked for almost twelve years now. This long time period should be evidence enough that corroborates that this list is a "blacklist.")*

The Defendant's **Docket Entry No. 45 states:**

"Some of the facts that Plaintiff disputes are facts she herself admits she does not know. For example, in Plaintiff's Response to Paragraph 18 of CMCSS's Statement of Undisputed Material Facts, Plaintiff states she is not "privy" to the practices CMCSS employs to hire teachers. Plaintiff's response to this paragraph is but one perfect example of the threadbare and unsupported allegations Plaintiff has made from the very beginning of this lawsuit. Plaintiff does not "know" that she has been discriminated because she has no facts that allow for a reasonable and calculated inference of the same.")

*(In response to this, the Plaintiff is correct about not being "privy" to the hiring practices of CMCSS and this "blacklist" again, proves this fact. Ms. Bunt was not informed that her name was on such a list. She did not even know such a list existed until October 12, 2021. CMCSS is deceptive and secretive about their hiring practices. Out of the clear blue a "blacklist" is discovered. The Plaintiff knew that there was something very nefarious going on and this "blacklist" demonstrates that there were egregious discriminatory practices taking place against the Plaintiff's applications in CMCSS by way of tortious interference in her "prospective employment relationships" with hiring officials/principals. The Plaintiff has now provided the Court, through this "newly discovered evidence" that her allegations were not and are not "threadbare" (defined as old and worn out) and "are not unsupported" as CMCSS told the Court they were. This is the epitome of deceitfulness. These facts that the Plaintiff has just provided to the Court more than "allow for a reasonable and calculated inference" that CMCSS was up to no*

36

*good! The Plaintiff can say this with exact certainty because of the discovery of the "blacklist with her name on it.)*

The Defendant's Statement of Undisputed Facts states at ¶5:

"CMCSS affords its principals autonomy for hiring in the best interest of a particular school, while complying with appropriate law."

*(In response to this statement, if principals are given "autonomy" in the selection, interviewing and hiring of candidates for teaching positions of which this term has been repeatedly used (See Affidavits of Melissa Izatt and Jeanine Johnson), then why are the hiring principals required to contact HR before requesting interviews of the ten individuals listed on the "blacklist?" for what purpose, but to keep the Plaintiff and the others from obtaining employment in CMCSS.)*

103.     What is devastating to the Plaintiff, is that the whole time Ms. Bunt's intuition told her that there was something very nefarious going on by CMCSS HR personnel and low and behold it was! The truth comes out eventually. Through this entire process it was stated that the Plaintiffs' complaints of what was happening to her was just a theory or a scheme and this discovery shows that it was absolutely not an "imagined theory" but a serious scheme on the part of CMCSS HR personnel to keep the Plaintiff blocked from a permanent full time teaching position within CMCSS.

104.     Why is Kathleen Bunt's name on any kind of list with CMCSS HR without informing her of this fact with the reasons/purposes for it? No one should discover something such as this in their life perpetrated on them by people they do not even know! The Plaintiff was not informed about it and neither was the Court. If it is a legitimate list of some kind then why so secretive? Why not present it to the Court as they have their other alleged hiring practices as described above and throughout all of the documents presented in this process?

105. Plaintiff provides the Tenn. Code Ann. §47-50-109 in support of this tortious interference Complaint as described above.

"Tennessee recognizes both a statutory and a common law cause of action for intentional interference with contract, also sometimes called procurement of breach of contract or tortious interference with contract. The statutory cause of action is found at Tenn. Code Ann. §47-50-109. It is unlawful for any person, by inducement, persuasion, misrepresentation, *or other means*, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages. *[Acts 1907, ch. 154, § 1; Shan., § 3193a8; mod. Code 1932, § 7811; T.C.A. (orig. ed.), §§ 47-1706, 47-15-113.]*" *https://law.justia.com/codes/tennessee/2010/title-47/chapter-50/47-50-109/*

106. Plaintiff has provided her evidence above that supports the following elements of a tortious interference claim:

"Plaintiffs have recovered against employers engaging in blacklisting by pursuing common law claims such as defamation, slander, invasion of privacy, intentional infliction of emotional distress, *and tortious interference with an employment relationship.* The latter claim is perhaps the most prevalent common law claim stemming from blacklisting conduct. Depending upon the circumstances presented, such a claim can be characterized as *tortious interference with a* business or *employment relationship,* tortious interference with contract, or tortious interference with a prospective economic advantage (collectively referenced as "tortious interference")." *"The basic principle of a 'tortious interference' action is that one, who without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby." Fitzgerald v. Roadway Express, Inc., 262 F.Supp.2d 849, 859-60 (N.D.Ohio 2003).* Although the

38

components of a prima facie claim of tortious interference vary among jurisdictions, there are typically four primary elements in the blacklisting context: (1) the **existence of a valid employment relationship** *or expectancy* between the plaintiff and a third party; (2) the *defendant's knowledge* **of the employment relationship** *or expectancy;* (3) *the defendant's intentional and wrongful interference* **with the employment relationship** *or expectancy;* and (4) *damages* **to the plaintiff** *as a result of the defendant's interference. See, e.g., James v. Int'l Hotels Group Res., Inc., 2010 U.S. Dist. LEXIS 11593 (D.Ill. 2010)* (listing elements of claim of tortious interference with prospective economic advantage or business relationship under Illinois law). *https://www.troutman.com/images/content/4/4/v1/4446/Blacklisting_2011.pdf*

107.    Other important case law relevant to "Blacklisting and Tortious Interference."

"Blacklisting under Title VII and the Age Discrimination in Employment Act ("ADEA") within the general workplace, ___the federal courts agree that blacklisting entails "any action" by an employer that prevents an individual from obtaining another position___ or that causes that individual to lose a new job. *See Sherman v. Burke Contracting, Inc., 891 F.2d 1527, 1532 (11th Cir. 1990)* ("The distinction between a blacklisting that prevents a former employee from obtaining a new job and similar conduct that causes him to lose a new job is meaningless."). *https://www.troutman.com/images/content/4/4/v4446/ Blacklisting_2011.pdf*

*"Recently, the Tennessee Supreme Court changed the legal landscape in Tennessee by expressly recognizing a cause of action for intentional interference with business relationships, ___including prospective and non-contractual relationships,___ in Trau-Med of America, Inc. v. Allstate Insurance Company 71 S.W.3d 691 (Tenn. 2002), decided March 25, 2002.* In so doing, the Court overruled its decision five years earlier in *Nelson v. Martin 958 S.W.2d 643 (Tenn. 1997)* wherein the Court had rejected prospective and non-contractual interference claims. *" https://www.lypelaw.com/a-murky-intersection-between-employment-law-and-business-torts.html*

108. Plaintiff has provided additional case law that pertains to the right to pursue the employment of one's choice.

"In 1950, the Tennessee Supreme Court decided a forerunner to modern interference cases in the context of at will employment, *Dukes v. Brotherhood of Painters, Decorators & Paperhangers of America, Local Union No. 437. 191. See Tenn. 495, 235 S.W.2d 7 (1950).* The ***Court quoted from other authorities which stated*** that ***even an "at will" employee has a "property right" in continued employment, and it determined that the painter had stated a recognizable cause of action. The Court also noted that to be actionable, the interfering conduct must be "without justifiable reasons," which calls into play the motive and means used to accomplish the interference.*** The Supreme Court decided a similar case involving a painter whose employment was terminated due to interference by the local painters' union in *Large v. Dick* in 1960. *See 207 Tenn. 664, 343 S.W.2d 693 (1960.)* In that case, ***the Court reiterated*** that ***"every man has the right of property in his own labor, and the right to work without interference; and whoever intentionally interferes with this right is liable in tort for the damages caused, unless he can show a privilege or justification for such interference."*** *See 207 Tenn. at 667-68.* Again the Court's caveat regarding "privilege or justification" made a fact-sensitive inquiry into the actor's motivation and means necessary. *https://www.lypelaw.com/a-murky-intersection-between-employment-law-and-business-torts.html*

## ADDENDUM TO COMPLAINT

The following information is being added here because it is very relevant to the overall Compliant.

109. The information provided in this section pertains to the CMCSS new applicant tracking system—Recruit and Hire and should be recognized as evidence pertaining to Retaliation and the Blacklist that is attached

Timeline:

July 14, 2017—New Recruit and Hire applicant tracking system is implemented in CMCSS (See Exhibit 14)

40

August 31, 2017—Plaintiff's first applications in the new Recruit and Hire system (See Exhibit 35a) Leadership for Life WCMS and Title I Consulting Teacher-Parent Involvement (Both marked "Ineligible"—See Exhibit 35a and See Exhibit 54—marked ineligible several times in other documents such as email confirmations from the system and an email response from Tabitha Perry that answers Plaintiff's inquiry concerning being marked ineligible for both positions of which Plaintiff was qualified for (See Exhibit 54—shows job description for both positions and the qualifications are identical).

Notice on the Blacklist (attached)—the first application that Plaintiff submitted to the Recruit and Hire system is listed--Leadership for Life West Creek Middle School, but does not include Title I Consulting Teacher Parent Involvement dated August 31, 2017, because the Leadership for Life position was the "first" entered application in the system.

The Leadership for Life position was used by the Defendant in the Plaintiff's current/pending case to discredit her ADEA claim. In the EEOC Position Statement (See Exhibit 16, p. 7, 2nd paragraph) of which states that Plaintiff "met the credentialing requirements" and in the Defendant's Motion for Summary Judgement (Docket No. 34, p. 16, 1st paragraph), CMCSS HR used this same position, Leadership for Life that the 56 year old was hired for—Both times CMCSS used this position and marked Plaintiff as eligible in these documents for the sole purpose of making it appear that they hired "one" individual that was older than the Plaintiff, but yet marked the Plaintiff "ineligible" several times in the Recruit and Hire System and in email confirmations and in email correspondence as describe above and is evidenced in Exhibit 54).

CMCSS HR blocked Plaintiff in the Recruit and Hire system for both positions and never once mentions the Title I Consulting Teacher-Parent Involvement in either the Position Statement or the Motion for Summary Judgement, but yet uses the Leadership for Life positions to discount Plaintiff's ADEA age discrimination claim in official documents with the EEOC and the Court.

Plaintiff was eligible all along for the Leadership for Life position, but CMCSS marked her "ineligible" in the system in order to block her application along with the Title I Consulting Teacher-Parent Involvement position from hiring

41

officials/principals (See Exhibit 54, both have identical qualifications on the job descriptions).

Since this application, Leadership for Life is on the Blacklist and it states in the two columns "Must contact HR before requesting an interview" then this demonstrates that Plaintiff was actually eligible in the system and was eligible for an interview, but CMCSS HR blocked her from getting an interview invitation by way of the blacklist and by way of marking her in the Recruit and Hire System as "ineligible" therefore blocking her application from being seen by the hiring principals. The blacklist would be used in case Plaintiff contacted the hiring principal directly via email or phone. The hiring principal would see her name on the list and therefore Plaintiff would be denied interview.

Notice all of the other dates for the other nine names listed on the blacklist (attached) the dates appear to be these applicants very first applications in the Recruit and Hire System— The dates are as follows in the order as they appear of this list:

August 28, 2017

July 26, 2017

July 23, 2017

July 21, 2017

August 4, 2017

July 25, 2017

August 14, 2017

August 20, 2017

August 31, 2017

July 24, 2017

All of these dates are very near the date when the New Recruit and Hire System was implemented by CMCSS HR—July 14, 2017 (See Exhibit 14) within a month and a month and a half.

Notice August 31, 2017, Plaintiff's first application in the System and the Blacklist has it listed as Leadership for Life. The point is, is that all of these applications were the very first applications in the new Recruit and Hire System

and CMCSS HR "Flagged" all of these individuals at the "first moment" that each of them applied and each were placed on the Blacklist from that point on, including Plaintiff's. This is evidenced in the way that CMCSS HR neglected to update Plaintiff's applicant record in the Recruit and Hire system as follows:

Plaintiff's application status in the new Recruit and Hire system has never been updated regarding "Past Interviews" and "Interview Documents" (See Exhibit 35a, p. 4, 5 and 6). Notice that the system on this on Exhibit 35a shows a date of February 5, 2021.

Plaintiff had interviews on (that she requested):
October 24, 2017 Northwest High School Business Education position (See Exhibit 49)
December 8, 2017 West Creek High School Career Exploration position (See Exhibit 77)
The Recruit and Hire system has never been updated by CMCSS HR personnel to document these interviews in the system. (See Exhibit 35a, p. 4-5). There was no need to because Plaintiff was on a Blacklist anyway.

Plaintiff had two interviews and therefore there should be interview "documents" that were posted in the system by CMCSS HR that the principals were required to document per the Affidavit of Theresa Muckleroy ¶ 32 which states:
"The HR electronic process mentioned above (¶ 15-19) also requires that an electronic form be completed to document each interview. A recommendation form is also completed on the candidate selected, as well as documentation of two reference checks. All these electronic forms were completed as required."

Therefore, based on Theresa Muckleroy's sworn Affidavit, Plaintiff should be able to see her "documents" for both the interviews at Northwest High School position and West Creek High School positions, but absolutely nothing is there (See Exhibit 35a, p. 6) as of February 5, 2021, two and three years later. The

43

reason is "there was no need to post any documentation because Plaintiff was on the Blacklist anyway.

Yes, it could be possible that this could be a simple mistake, with one interview, but not with two interviews, with two separate principals at two separate high schools, with two sets of documentation that were required to be posted in the electronic system never was. This is because Plaintiff was on the Blacklist and it was not necessary to complete any updates.

Plaintiff's applications in the system are just that, applications. CMCSS has never kept Plaintiff's applicant record up to date as evidenced in Exhibit 35a and as explained above because there was no need to since Plaintiff was on the blacklist.

One last thing, there should be a note in the system from Dr. Jessica Peppard from Northwest High School where she states that she notated Plaintiff's decline of the interview at Northwest High School of which she admitted in Exhibit B to Affidavit of Melissa Izatt, but that is not provided in the "documents" section of the Recruit and Hire system either. (See Exhibit 35a, p. 6).

Both the NWHS and WCHS interviews that took place, both sets of interview documentation that is required to be entered in the system and the notation that Dr. Peppard stated that she would put in Plaintiff's application are simply not there as of February 5, 2021 (Exhibit 35a, p. 6-date at bottom of page), three years since NWHS, two years since WCHS interviews and one year since decline of NWHS. All of this is not because of clerical errors. All of this was unnecessary to do because Plaintiff was on a Blacklist and it was a waste of time to keep her applicant records in the Recruit and Hire up to date because she was never going to be hired anyway, at least this is what the evidence appears to be otherwise Plaintiffs information would be all there in total and documented thoroughly.

44

All of this evidence shows that Plaintiff was blocked from employment by
CMCSS HR and her applicant record is of no significance to them whatsoever or
Plaintiff would see the required documentation posted in her applicant profile
(Exhibit 35a) and absolutely nothing is there.

**WHEREFORE, premises considered, plaintiff prays as follows:**

1. That the defendant be served with a Summons and Complaint and be required to answer within the time prescribed by law.

2. That the Plaintiff be appointed legal representation or even limited legal representation by the Court as she has been unable to secure and is continuing to search. Plaintiff is Pro Se at this time and is doing so in order to preserve her rights under the 90 day statute of limitations—EEOC which is now tolling of the statutes as agreed upon by her former legal counsel Mr. Ross Pepper and the Defendant's legal counsel, Mr. Charles Cagle until thirty days after mediation.

3. That the Plaintiff be awarded: back pay: $124,174.00; front pay: $805,722.00; loss of the value of benefits 100,000.00; $3,089,688.00 compensatory damages for emotional distress, loss of the quality of life and loss of enjoyment of life and damage to professional reputation.

4. That the Plaintiff not be required to sign any non-disclosure agreements for tax purpose reasons.

5. That the Plaintiff be provided with a letter of reference/recommendation from her Substitute Program supervisor for her almost ten years of service, for use with future employment endeavors and that the Defendant be prevented from making disparaging references to potential employers if and when they are contacted by one in the future concerning the Plaintiff.

6. That the Plaintiff's name be removed from all "blacklists" and be informed if she is ever put on any type of list in the future.

7. That the Plaintiff be awarded reasonable attorney fees and that the court cost of this cause be assessed against the Defendant.

8. Jury Demand

9. And any other relief deemed just and proper by the Court.

Respectfully submitted,

*[signature]*

Kathleen A. Bunt
255 Forbes Avenue
Clarksville, Tennessee 37040
Phone: 931-648-8164/931-436-4788
kbunt@bellsouth.net

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on _12/1/21_ , all counsel of record are being served by certified mail a true and correct copy of the foregoing document, in compliance with Rule 5 of the Federal Rules of Civil Procedure.

United States District Court, Middle District of Tennessee
Office of the Clerk
United States Courthouse
801 Broadway, Suite 800
Nashville, Tennessee 37203
615-736-5498

Charles Cagle
Lewis, Thomason, King, Krieg & Waldrop, P.C.
424 Church Street, Suite 2500
Post Office Box 198615
Nashville, Tennessee 37219
615-259-1366

46

Kathleen Bunt
255 Forbes Avenue
Clarksville, TN 37040

7019 2970 0001 1263 6624

U.S. POSTAGE PAID
PM 1-DAY
CLARKSVILLE, TN
37040
DEC 01, 21
AMOUNT
**$15.60**
R2304N116824-15

1008    37203

**PRIORITY MAIL®**
UNITED STATES POSTAL SERVICE

Visit us at usps.com

Label 107R, January 2008

RECEIVED
in Clerk's Office

DEC 02 2021

U.S. District Court
Middle District of TN

United States District Court
Middle District of Tennessee
Office of the Clerk
United States Courthouse
801 Broadway, Suite 800
Nashville, Tennessee 37203