# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| KATHLEEN BUNT, | ) |  |
|  | ) |  |
|    Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | **Case No. 3:21-cv-00896** |
|  | ) | **Judge Aleta A. Trauger** |
| CLARKSVILLE MONTGOMERY | ) |  |
| COUNTY SCHOOL SYSTEM, | ) |  |
|  | ) |  |
|    Defendant. | ) |  |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 39) filed by defendant Clarksville Montgomery County School System ("CMCSS"), seeking judgment in its favor on the plaintiff's retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). As set forth herein, the motion will be granted, and this case will be dismissed in its entirety.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Kathleen Bunt has been employed by CMCSS as a substitute teacher since 2014. From 2012 to 2014, she worked as a substitute teacher for CMCSS through Kelly Educational Services, a subcontractor used at that time by CMCSS for placing substitute teachers.

Bunt filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (through the Tennessee Human Rights Commission) on January 10, 2018,

---

[1] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Responses to CMCSS's Statements of Undisputed Material Fact (Doc. No. 45-1), either admitting the facts or admitting them for purposes of summary judgment only. All facts set forth herein are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

alleging age discrimination and retaliation based on her having filed a Title VII discrimination charge against her previous employer in 2010, which was resolved in 2014. (Doc. No. 1-4, at 2 ("January 2018 EEOC Charge").) The substantive claims raised in that charge are not at issue in this lawsuit. Rather, the plaintiff alleges that, following that filing, she suffered retaliation by CMCSS for having filed the January 2018 EEOC Charge. She filed a subsequent EEOC Charge on August 26, 2019 (*see* Doc. No. 1-4, at 5 ("August 2019 EEOC Charge")), alleging continuous retaliation since filing the January 2018 EEOC Charge, in the form of being denied interviews for positions, threatened and intimidated, "denied a long-term substitute position under false pretenses," subject to "increased scrutiny in the classroom," and "marked ineligible in the applicant tracking systems for positions [for which she] was eligible," among other things. (Doc. No. 1-4, at 6.)

The plaintiff states that she filed a lawsuit in this court on October 17, 2019, after receiving the EEOC notice of dismissal and notice of right to sue, raising the claims alleged in the January 2018 EEOC Charge. (*See* Doc. No. 1, Pro Se Complaint ("Compl.") ¶ 25.) The court takes judicial notice that that lawsuit was actually filed in the Circuit Court for Montgomery County, Tennessee on October 17, 2019 and removed to this court on November 15, 2019. *Bunt v. Clarksville Montgomery County School System*, No. 3:19-cv-01013 (M.D. Tenn. Nov. 15, 2019) (Doc. No. 1, Notice of Removal). The court also takes notice that that case settled in May 2022 and was dismissed by stipulation in January 2023.

The plaintiff filed yet another EEOC charge on July 9, 2021 ("July 2021 EEOC Charge"), alleging that she had suffered age discrimination and retaliation when she was denied a Career Exploration teaching position at West Creek High School on December 18, 2019.

The plaintiff filed the present lawsuit, *pro se*, in December 2021, asserting age discrimination in violation of the ADEA, retaliation in violation of the ADEA and Title VII, and tortious interference with a prospective business relationship in violation of Tennessee common law. (Doc. No. 1.) The court previously granted in part CMCSS's Motion to Dismiss, dismissing the tortious interference claim and the claims arising out of CMCSS's failure to hire her for the Career Exploration teaching position at West Creek High School on December 18, 2019 that were the subject of the July 21 EEOC Charge but leaving intact her other retaliation claims. (Doc. No. 19, 20.)

As relevant to the remaining retaliation claims, the plaintiff identifies numerous events and actions against her that she claims were in retaliation for the January 2018 EEOC Charge and/or the two later charges, including: (1) numerous classroom observations of her beginning immediately following the filing of the January 2018 EEOC Charge, which she characterizes as "increase[d] scrutiny" (Compl. ¶ 37); (2) an incident that took place at Northwest High School in May 2019, when Assistant Principal Shane Smith yelled at her and humiliated her in front of a class full of students (the "Shane Smith incident") (*id.* ¶ 39); (3) the denial of interviews for three full-time teaching jobs in October 2018, March 2019, and June 2019 (*id.* ¶ 38); (4) the denial of a long-term substitute job at Northeast High School in the spring of 2019 "based on false pretenses" (*id.* ¶ 41); (5) not being called by the CMCSS telephone system for all the substitute jobs for which she was eligible (Compl. ¶ 42); and (6) her exclusion from positions substituting at four particular schools (West Creek High School, Kenwood High School, Montgomery Central Middle School, and Northeast Middle School) (*id.* ¶¶ 44, 54).

The facts in the record regarding each of these claims are as follows.

A.    The Numerous Classroom "Observations" of the Plaintiff

Bunt alleges that, although it is normal for a teacher or a substitute teacher to receive one or two principal observation visits per year, after she filed her January 2018 EEOC Charge, she received "in excess of twenty-four" observation visits from school principals and others while she was substitute teaching. (*Id.* ¶ 37.) She claims these visits began immediately after she filed the January 2018 EEOC Charge and continued for the next one and one-half years. (*Id.*)

The first of these visits was from Michael Tharpe in his capacity as HR Coordinator or "Employment Process Coordinator." (*See* Doc. No. 42-12, Tharpe Decl. ¶ 5; Doc. No. 42-11, at 23.) Tharpe conducted an in-person observation of Bunt in the Northeast High School classroom where she was working as a substitute teacher on January 24, 2018. After his observation, Tharpe completed a "CMCSS Substitute Performance Feedback" form on which he provided a markedly positive evaluation report on Bunt. (*See* Doc. No. 42-12, at 4.) Despite the positive evaluation, Bunt testified that the fact that this observation occurred so close in time to the filing of her January 2018 EEOC Charge caused her to be suspicious that the events were related. (Doc. No. 42-1, Bunt Dep. 54.) She characterizes the visit as retaliatory.

Tharpe has submitted a Declaration in which he attests that he was not aware that Bunt had filed any EEOC charge or a civil lawsuit against CMCSS when he observed Bunt in 2018. (Tharpe Decl. ¶ 6.) He also states that, if he had known, it "would not have mattered to [him], and [he] would have considered it none of [his] business." (*Id.*) He states that he is not aware of any retaliation by CMCSS against Bunt for filing EEOC charges or for any other reason. (*Id.* ¶ 9.)

In addition to Tharpe's visit, the plaintiff claims that she experienced increased scrutiny of her performance following the filing of the January 2018 EEOC Charge in the form of numerous other unannounced classroom visits. She documented these visits on a list she produced in discovery. According to this list, she experienced such observation visits on approximately

fourteen occasions from August 2018 through November 2018 and on six more occasions during the spring of 2019. (*See* Doc. No. 45-2, at 21–23.) Bunt's notes are cursory, but they indicate that the visits ranged from period-long observations to brief "walk throughs." *Id.* The visitors included principals, assistant principals, behavioral specialists, counselors, other teachers, and unknown others. (*Id.*) Bunt testified that these continued visits, which she had never before experienced, made her "very uncomfortable," and her complaint about them is based on the fact that "they continued and continued and continued." (Bunt Dep. 55.) She explained:

> I think there was 20 to 26 of them. . . . There were principals coming to my classrooms at all of the schools and standing there. And I had no idea. Nobody is writing anything. They're just standing there. Like, as in my mind, I'm thinking, as time went on and all of those were happening, I'm thinking to myself, man, what did they just want to see who this is that filed the charge against Clarksville schools?

(*Id.* at 52.) She has not indicated that any of these visits resulted in a negative evaluation or otherwise affected her employment. She believes, based apparently on the timing and numerosity of the observation visits, that they were related to her January 2018 EEOC Charge.

These visits were one of the topics Bunt complained about in the second of two emails (Doc. No. 42-11, at 21–25) sent on May 23, 2019 to Jeanine Johnson, then CMCSS's Chief Human Resources Officer ("CHRO") (Doc. No. 42-8, Johnson Decl. ¶ 2), and copied to Melissa Izatt, then Substitute Teacher Coordinator in CMCSS's Human Resources ("HR") Department (*see* Doc. No. 42-11, Izatt Decl. ¶ 3), and Curtis Smith of the EEOC. Izatt responded by email on June 5, 2019. (Doc. No. 42-11, at 30.) Regarding this issue, Izatt stated that the Substitute Department did not control principal visits but that such visits were "not necessarily a reflection on [sic] a principal's perception of a teacher or substitute's abilities." (*Id.* at 31.) Regarding Tharpe specifically, Izatt noted that his job description included conducting substitute evaluations but that, given the hundreds of substitutes in the district, it was not surprising that this was the first time he had observed Bunt. Izatt attached a copy of Tharpe's positive evaluation to her response. (*Id.*)

Jeanine Johnson also responded to the plaintiff's concerns that she was experiencing retaliation for having filed an EEOC charge, notifying her that, while Johnson herself, as CHRO, had received notice of the filing from the EEOC, she did not share its existence with anyone other than certain administrators in the Central Office on a need-to-know basis. She denied sharing it with school administrators. (*Id.* at 32.) Johnson likewise avers in a Declaration that, although as CHRO for CMCSS, she would have notice of the plaintiff's EEOC charges, she did not share that information with any school administrator or principal of CMCSS. (Doc. No. 42-8, Johnson Decl. ¶ 8.)

Similarly, Izatt specifically avers under oath that it remains CMCSS's practice not to disseminate information that an employee has filed an EEOC charge:

> Only administrators with Central Office (such as the CHRO, the Director of Schools, or general counsel) would have knowledge of an employee's EEOC charge. This would not be known by an administrator inside an individual school unless the employee volunteered such information.

(Izatt Decl. ¶ 7(f)(4).)

## B.    The Shane Smith Incident

The plaintiff also believes that Assistant Principal Shane Smith was excessively rude to her in an encounter that took place on May 21, 2019 and that his conduct toward her was in retaliation for her having filed the January 2018 EEOC Charge. The plaintiff's roughly contemporaneous account of the event is set forth in the first of her two emails to Jeanine Johnson, Melissa Izatt, and Curtis Smith dated May 23, 2019. (Doc. No. 42-11, at 15–20.) As Bunt explains in this message, she was substituting for two days at Northwest High School ("NWHS"), was assigned to a classroom filled with rowdy and uncooperative students, and did not have the classroom assistance she normally should have had. (*Id.* at 16.) On the second day of her assignment, which was apparently the last day of school for the year, the class was in "chaos," and, because she could not

get the students to cooperate, she asked the teacher in the classroom next to hers for assistance. This teacher, Mr. Large, stepped into the room and then immediately "called an administrator," as he knew "this would be required to settle [the students] down and get them to cooperate." (*Id.*) As soon as they knew an administrator had been called, the students began to move toward their seats. Assistant Principal Shane Smith stepped into the room and immediately began calling roll without listening to the students' responses. After he finished calling names, Smith told the students to do something to occupy themselves, such as listening to music or looking at their phones; he then left the room without addressing the behavioral issues. (*Id.* at 17.)

After lunch, in 5th period, the class was in utter chaos again, and Large again called administration for Bunt. Smith returned to the room as Bunt was "trying to yell over the students to get them to quiet down," as they were "in a very loud roar." (*Id.* at 18.) When Smith walked in, Bunt told him, "This is why I had to call you again." (*Id.*) Instead of directing his energies toward the unruly class, Smith said to her: "You need to lower your tone, You ma'am are riling them up!!!" (*Id.*) Bunt denies that she was riling the students up; she was trying to quiet them down, which she began to try to explain to Smith. He "dismissed" her, literally yelling at her that she was "dismissed" and to "go to the office." (*Id.*) At that point, the students were stunned into silence, and Smith again directed Bunt to leave. She began to gather her belongings, and she "stated, students you need to inform Mr. Smith of the truth." (*Id.*) Mr. Smith then yelled at her, in front of 25 students, "You are going to jeopardize your future in this district[.]" (*Id.*) When she finally left the room, he said, "Thank you" in a sarcastic tone. (*Id.*)[2]

---

[2] Smith's recollection of the incident varies only slightly from Bunt's. He states in a Declaration that, when he entered Bunt's out-of-control classroom the second time on May 21, 2019, she stated to him, "This is what I'm talking about," while motioning to the class. (Doc. No. 42-13, Smith Decl. ¶ 7(c).) According to Smith, it appeared to him that Bunt's being in the classroom was making matters worse, so he asked her to leave and to report to the front office,

When she reported the incident to the school principal, Dr. Theresa Muckleroy, Muckleroy stated that Smith "should not have done that" and that she would speak to him about it. (*Id.* at 19.) Muckleroy appeared apologetic, but when Bunt "opened up to Dr. Muckleroy about [her] EEOC charge and that threats should not be being made to [her] in this manner or any manner," Muckleroy responded that she did not know anything about an EEOC charge and did not want to know. (*Id.*) Bunt speculated that Muckleroy actually did know about the EEOC charge, based on her glimpsing a "smerk [sic] out of the corner of her mouth and kind of glare," as if Muckleroy were thinking to herself, "you had this coming." (*Id.*)

The plaintiff assumed that Smith knew about her January 2018 EEOC Charge when he made the comment to her about jeopardizing her future with the school district. This assumption was based on her perception that, prior to January 2018, her periodic interactions with Smith, when she happened to be substituting in classrooms in the same hallway as his office, were "pleasant," but after January 2018, he generally ignored her, up until the incident in which he "threatened [her] future with CMCSS." (Doc. No. 45-3, Bunt Decl. ¶ 3.)

Smith, in his Declaration, attests that he was not aware in May 2019 that Bunt had filed a civil lawsuit against CMCSS, nor was he aware that she had filed any type of EEOC charge. (Doc. No. 42-13, Smith Decl. ¶ 5.) He states that the only direct personal interaction he ever had with Bunt was in the course of the May 21, 2019 incident. (*Id.* ¶ 7.)

---

with the intention that she be reassigned to a different classroom. (*Id.*) However, instead of complying with his request, Bunt objected and defended her actions, thus focusing the classroom's attention on herself. At that point, Smith allegedly "asked her again to leave the classroom and [told her] that if she persisted she would be jeopardizing her future as a substitute teacher." He reported his account of the incident to Principal Muckleroy in an email dated May 21, 2019. (Doc. No. 42-13, at 5.)

In her email reporting the incident to Johnson and Izatt, Bunt expressed her belief that Smith's attitude toward her was "his way of getting even with [her] for making the [EEOC] charge . . . about his boss" (presumably referring to the January 2018 EEOC charge) and that the incident constituted a "threat to [her] 'position in the district." (Doc. No. 42-11, at 19, 20.) Izatt responded to this allegation in her response email dated June 5, 2019, stating that she was "sorry [Bunt] had such a bad experience" but glad she had shared her concerns with Dr. Muckleroy. (*Id.* at 31.) She also made a point of reassuring Bunt that she was "not in danger of losing [her] job as a substitute with this District." (*Id.*) Izatt also offered to facilitate a meeting between Smith and the plaintiff when the new school year began, with the hope that such a meeting might be "helpful going forward and help [Bunt] to feel more comfortable" if she wanted to continue substituting at that school. (*Id.*) The plaintiff did not accept this offer. (Izatt Decl. ¶ 7.)

### C. Denial of Interviews for Three Full-Time Teaching Positions

Bunt also claims that, in retaliation for her having filed the January 2018 EEOC Charge, she was denied interviews for three teaching positions with CMCSS for which she applied: "College and Career" Related Arts Teacher at West Creek Middle School; CTE Consulting Teacher ("CTE position") at Central Services South; and Career Exploration Teacher at West Creek High School ("CE Teacher").

Bunt testified that she applied for the Related Arts Teacher position in October 2018 but was denied an interview. (Bunt Dep. 83.) She stated that she did not receive a response to her application or an invitation to interview. (*Id.* at 87.) She assumed that the reason she was denied an interview was in retaliation for having filed the January 2018 EEOC Charge. The plaintiff complained about her being denied an interview for this position in her second May 23, 2019 email to Izatt and Johnson. (Doc. No. 42-11, at 23–24.) The court has not been made aware of any other information about this position.

Regarding the West Creek High School ("WCHS") CE Teacher position, the plaintiff alleges that she was denied an interview for this job in March 2019. (Bunt Dep. 83–85.) The plaintiff complained about this in her May 23, 2019 email to Johnson and Izatt. In response, Johnson responded that she had already explained to the plaintiff that the principal in that case had decided to administratively transfer an eligible teacher already at his school to fill the position and therefore did not conduct any interviews. (Doc. No. 42-11, at 32.) According to Johnson, this is "an acceptable practice," as each principal "is in the best position to know the staffing needs of his/her specific school," and the Human Resources Department does not get involved in such hiring decisions other than by ensuring that principals "make hiring decisions in accordance with the law and District policy," in view of which the "HR Department trains its principals annually on hiring practices and principals are aware of and follow EEO laws." (*Id.*) She reiterates these statements under oath in her Declaration. (Johnson Decl. ¶¶ 11, 13.)

The plaintiff attributed the decision to then-WCHS Principal Matthew Slight. Slight has submitted a Declaration in which he attests that he did not know when he made hiring decisions for the CE Teacher position that Bunt had filed any EEOC charge or lawsuit against CMCSS, that he would not have been in a position to be privy to that information, and that he did not retaliate against her for any reason with respect to any of his decisions regarding whom to interview and whom to hire. (Doc. No. 42-10, Slight Decl. ¶¶ 3, 6.)[3]

---

[3] The individual who was initially hired for that position apparently did not stay in it, so the position was posted again as open in the fall of 2019. Principal Matthew Slight interviewed Bunt for the CE Teacher position in December 2019 but ultimately selected a different candidate for the position. (Doc. No. 42-10, Slight Decl. ¶ 5(d).) Slight states in his Declaration that he did not know when he interviewed Bunt or when he made the hiring decision for the position that Bunt had filed any EEOC charge or lawsuit against CMCSS. (*Id.* ¶¶ 3, 6.)

In any event, the plaintiff's having been denied this job in December 2019 was one of the subjects of the plaintiff's July 2021 EEOC charge. The defendant moved for dismissal of the claims arising from this particular hiring decision as time-barred. The court granted the motion as to this

Bunt submitted an application for the CTE position on June 18, 2019, at 9:10 p.m. Jean Luna-Vedder was CMCSS's Director of High Schools when the hiring decision for that position was made. Luna-Vedder states in her Declaration that she filled the CTE position with an administrative transfer on June 19, 2019. (Doc. No. 42-7, Luna-Vedder Decl. ¶ 5(c).) According to Luna-Vedder, at the time she made her hiring decision, Luna-Vedder did not know that Bunt had submitted an application less than 24 hours previously. (*Id.* ¶ 5(c)–(f).) Moreover, she also did not know that Bunt had filed EEOC charges or a lawsuit against CMCSS and did not learn that Bunt had done so until sometime after Luna-Vedder became CMCSS Director of Schools in July 2022. (*Id.* ¶ 6.) Luna-Vedder denies that she or anyone else with CMCSS retaliated against Bunt for filing EEOC charges or a lawsuit or for any other reason. (*Id.* ¶ 7.)

Luna-Vedder also explained that the candidate selected for the CTE position, Karen Pitts, had submitted an internal transfer request for the position, had previously served as the CMCSS CTE Coordinate for nine years, and had ten years of vocational teaching experience with CMCSS prior to that. (*Id.* ¶ 5(d).) In Luna-Vedder's assessment, Pitts was an "excellent candidate with a wealth of relevant experience" for the position. (*Id.* ¶ 5(e).) Luna-Vedder did not know whether,

---

discrete hiring decision, because it is clear that any claim arising from the December 2019 hiring decision was time-barred by the time the plaintiff filed the EEOC charge raising it in July 2021, almost 600 days later. However, the plaintiff's retaliation claim in Count II of the Complaint was not dismissed in totality, as the defendant's Motion to Dismiss did not address the other allegedly retaliatory actions the plaintiff also claimed to have suffered after filing her August 2019 EEOC charge. (*See* Doc. No. 19.) To the extent there was any ambiguity in the Memorandum and Order granting in part the defendant's Motion to Dismiss, the court here confirms that its dismissal of the plaintiff's discrimination claim arising from Slight's decision to not hire the plaintiff in December 2019 as time-barred encompassed all "discrimination" claims—including retaliation—arising from that event. In addition, the record now establishes that Slight was not aware when he made that hiring decision that the plaintiff had engaged in protected activity. Even if the claim based on that decision had not been dismissed, the defendant would be entitled to summary judgment on the claim.

if Bunt's application had been submitted in a timely fashion, she would have hired Bunt instead, because Pitts was an excellent candidate, but she believes she would have at least considered Bunt for the position. (*Id.* ¶ 5(g).)

###### D.     Denial of Long-Term Substitute Job at Northeast High School in Spring 2019

The plaintiff complains that she was "denied a long term substitute position based on false pretenses," which she complained about to Izatt and Johnson in her second May 23, 2019 email. (Compl. ¶ 41; *see also* Doc. No. 42-11, at 21–23.) According to this email, the plaintiff was contacted by Lisa Casey, a history teacher at Northeast High School, requesting that Bunt substitute for her while Casey was out for surgery. Although the plaintiff agreed, when she followed up with Casey approximately a week before the assignment was to begin, she learned that "Mr. Massey and the substitute person at NEHS . . . said no about [Bunt] subbing for [Casey] and that [Casey] need[ed] to call the sub office." (Doc. No. 42-11, at 21.)

Bunt felt this was very unfair, because "it is possible for teachers to recommend substitutes" and she has witnessed this happen on a regular basis and has herself previously received at least five long-term "sub jobs" through this route. (*Id.*) When she contacted the Substitute Office to inquire what had happened in this case, Adrienne White informed her that the "selection for Casey was a substitute that is certified in history and that is what is looked at initially for any long term position" and that White's practice is to "first look at the subject matter and try to put a certified person in the position of the assignment." (*Id.* at 22.) The plaintiff, however, happened to have a substitute job at NEHS across the hall from Casey's classroom while Casey was out for surgery, and she learned from the individual assigned to substitute for Casey that he was not, in fact, certified in history. He was instead certified in English. (*Id.*)

Bunt also reported that she found out at the same time that another history teacher at NEHS was out for maternity leave and that her long-term substitute, Ms. McCoy, who was a regular

substitute at NEHS, did not have a teacher license or any other certification that would permit her to work as a long-term substitute. According to Bunt, Adrienne White explained to her that McCoy could substitute for any period less than 20 days. The plaintiff believed, however, that McCoy had been substituting for at least 27 days, from April 12 through May 21, the last day of exams. (*Id.*) Bunt also complained that, regardless of McCoy's status, she was also aware that another regular NEHS sub who was not a licensed teacher—and therefore not qualified for long-term substitute jobs—had substituted for a teacher on active duty/reservist leave the entire first semester of that academic year. The plaintiff concluded this portion of her complaint to Izatt and Johnson by articulating her belief that she was being "prevented from long term subbing and earning extra pay that could have sustained [her] through [t]he summer months" in retaliation for having filed the January 2018 EEOC Charge:

> Three individuals as listed above were requested for long term positions, two of which are not licensed teachers, but subbed for more than 20 days. The sub that was brought in has equal credentials to mine in that neither of us hold a "History" certification. These facts make my suspicions real. I have been blocked from this long term sub job.

(Id. at 22; *see also* Bunt Dep. 91–94.) The plaintiff believes being denied the long-term substitute job at NEHS was retaliatory, based on its being "just another one of the things that happened . . . that shouldn't have happened." (Bunt Dep. 95.)

Melissa Izatt, as CMCSS's Substitute Teacher Coordinator at the time, responded on June 5, 2019 to Bunt's emailed complaint about having been denied the long-term substitute position at NEHS as follows:

> • As you are aware, with long term placements of over 20 instructional days, the District must fill with a substitute holding a license in the appropriate certification if one exists and is available. If not, we look to fill the position with a licensed substitute.

> • I understand that you are upset that you did not receive the long term substitute position for Ms. Casey's class at NEHS. When Ms. White responded to your

concerns, she inaccurately indicated that Mr. Johnson is certified in history. This was an honest mistake on her part, as at the time she was new to her position and she misunderstood what her predecessor told her. However, there were no certified history substitutes available or willing to fill the long term position at that time, and she appropriately filled it with a licensed substitute. While teachers can recommend substitutes for long term substitute positions, the final approval lies with the school's principal and the Substitute Coordinator. Ms. Casey should have been aware of that.

With respect to the substitute position for Katherine Turner (Batts) at NEHS, the records clearly indicate that Ms. McCoy did not fill a long term substitute position for more than 20 consecutive days.

• No one is preventing you for receiving long term substitute positions. The Substitute Department is aware you seek those positions, and in fact you have been in 2 long term substitute positions since January 2017. If you have information of specific actions taken by CMCSS employees that you feel have impeded your ability to be considered for a long term positions [sic], please provide that information to me so I may investigate.

(Doc. No. 42-11. at 30.)

In the Declaration filed in support of the defendant's motion, Izatt further explained that, in response to the plaintiff's emailed complaints, she and Johnson took her emails seriously and investigated the claims by speaking to "every person [Bunt] referenced by name" in the emails. (Izatt Decl. ¶ 7(d).) Izatt specifically avers that she did not find evidence that anyone at CMCSS was preventing Bunt from receiving long-term substitute teaching positions and that Bunt did not provide additional information to support her assertion that CMCSS employees were impeding her ability to be considered for long-term substitute positions. (*Id.* ¶¶ 7(e)(1)–(2).) The plaintiff objects to this response on the basis that Izatt did not allow Bunt to "present all of her information," did not take Bunt's complaints seriously, and did not resolve those complaints. (Doc. No. 45-1 ¶ 41.)

E.    **The Phone System**

In her second May 23, 2019 email to Izatt and Johnson, the plaintiff also complained about the Substitute phone system not calling her for all jobs for which she was eligible. She noted that

she had made many inquiries to various individuals at the Substitute Office, including Adrienne

White, as to

> why the substitute program SmartFind phone systems does not call me about open
> positions. I have to call the system every time to obtain sub jobs. What is really
> concerning about this is that when I call, and there are sub positions available for
> me to physically hear, and I am able to press the number to accept the job or jobs,
> then why had the phone system not called me since I am listed as available. If a job
> is available, and I am hearing it when I call, it should have called me, but it does
> not. Why? The system calls me for cancellations, but not for openings even though
> I have available days waiting to be filled. This has happened since the filing of my
> charge also.

(Doc. No. 42-11, at 23.)

> Izatt responded to this complaint as well:

> The SmartFind system does call you. The data indicates that for the 2018–2019
> school year, you have been called for [sic] 210 times for assignments. You accepted
> 153 of those calls. You hung up on 22 of those calls, and you did not answer 35 of
> those calls.

(*Id.* at 30; *see also* Doc. No. 42-11, Izatt Decl. ¶ 7(e)(3).)

Bunt objects to Izatt's testimony on the grounds that she herself has not seen the call logs

on which Izatt relies and based on her determination that subsequent call logs that have been

produced are not accurate. She maintains that the problems with the SmartFind phone system she

experienced were in retaliation for her having filed the January 2018 EEOC charge and prevented

her from learning about potential substitute teaching assignments. (Bunt Dep. 98–99.) She assumes

that CMCSS manipulated the system to decrease the number of calls she received, based on

Adrienne White's telling her that the system had a setting for "increase or decrease calling," which

the plaintiff would not have known about if White had not mentioned it. (Bunt Dep. 98–99.) Bunt

contends that, when she asked White if the school system had manipulated the "increase/decrease

calling in some way," White never responded. (*Id.* at 104.) Bunt therefore assumed that White did

not want to put anything about it in writing to her, and she assumed that the school system must

have manipulated the number of calls she received, because "[i]t's just another thing added to the list of things." (*Id.*)

CMCSS also filed the Declaration and Supplemental Declaration of Erica Christmas to address, in part, the plaintiff's allegations regarding the phone system issues. (Doc. Nos. 42-5 ("Christmas June 2023 Decl."), 46-1 ("Christmas Aug. 2023 Decl.").) Christmas states that she began working for CMCSS in July 2, 2019 and has served as Human Resources Coordinator, Substitute Program Manager in the HR Department, and Director of Classified Employment. (Christmas June 2023 Decl. ¶¶ 2–3.) Christmas states her understanding that Bunt filed an EEOC charge alleging retaliation on August 26, 2019, in which, among other things, she alleged that the phone system was not calling her for assignments. According to Christmas, in August 2019, the school system

> called available substitute representatives on the telephone, and we also utilized email communication. Substitute representatives had access to an application that they could use to choose their assignments, or they could log into the system via the Frontline website. Frontline captures all communication (except for emails sent by our office and calls made by the substitute representatives).

(*Id.* ¶ 5(d).)

Christmas apparently intended to attach to her June 2023 Declaration a call log showing "calls to and from Bunt between August 1, 2019 and March 19, 2021." (*Id.* ¶ 5(e).) The exhibit as filed was truncated, however, so she filed the August 2023 Declaration to respond to additional allegations from Bunt and to attach the complete call log. In response to Bunt's argument that Christmas should have produced a call log for the period between January 2018 and August 2019, Christmas states that she was only aware of the August 26, 2019 retaliation claim, which is why she reviewed the call log for the period of August 2019 through March 2021. (Christmas Aug.

2023 Decl. ¶ 4.)[4] According to Christmas, the referenced call log reflects that, in that time frame, Bunt "received approximately 132 calls from the system" in response to which Bunt did not accept the assignment and that she accepted 76 assignments during this time frame. (Christmas June 2023 Decl. ¶ 5(f); *see also* Doc. No. 46-1, at 6–8.)[5] In Christmas's opinion, "Bunt is factually incorrect in asserting that the school system was not calling her about available substitute teaching assignments," as the call log reflects that the system was calling Bunt about multiple assignments, some of which she accepted and some of which she refused, and that Bunt herself made calls into the system. (*Id.* ¶ 5(h).)

According to Bunt, the call log produced by the defendant contains multiple errors and does not reflect her actual experience. She states in her Declaration that she "neither received nor rejected many calls marked as 'rejected.'" (Doc. No. 45-3, Bunt Decl. ¶ 5.) In addition, she points out several instances in which the call log is inconsistent with her own records or internally inconsistent. Just as one example, she states that her records reflect that she had a two-day assignment at Richview Middle School on August 27–28, 2019, but the call log shows that she accepted jobs at both Kenwood High School and Rossview High School on August 27, 2019,

---

[4] This assertion is difficult to believe, because the August 2019 EEOC charge is expressly premised on the plaintiff's having filed the January 2018 EEOC Charge. (*See* Doc. No. 1-4, at 6.) Even if Christmas had not seen the actual August 2019 EEOC Charge containing that allegation, her first Declaration states her understanding that that charge alleged retaliation in the form of the plaintiff's not receiving telephone calls from the system, which begs the question of what prior act was alleged to have prompted the purported retaliation alleged in August 2019. Moreover, counsel for CMCSS obviously could and should have pointed out this fact and corrected Christmas's apparent misunderstanding before she filed either of her Declarations.

[5] This record produced by Christmas reflects that Bunt called into the system slightly more often than the system called her during the 2019–2020 school year (67 calls by Bunt versus 59 calls by the system to her) and that Bunt called the system substantially less frequently than the system called her during the 2020–2021 school system (11 calls to 73).

which would have been physically impossible. (*Id.*; *see also* Doc. No. 46-1, at 6.)[6] She also contends, however, that any analysis of the call log submitted by Christmas is "not material given that the time frame when she was complaining that the phone system not calling her was January 2018 – August 2019." (Pl.'s Resp. SUF ¶ 54.)[7]

### F. Exclusion from Substitute Positions at NEMS, MCMS, KHS and WCHS

In September 2021, after filing EEOC Charges in August 2019 and July 2021 and a lawsuit in October 2019, the plaintiff learned that she had been excluded from substituting at Northeast Middle School ("NEMS"), Montgomery Central Middle School ("MCMS"), Kenwood High School ("KHS"), and West Creek High School ("WCHS"). (Compl. ¶¶ 44, 54.) The plaintiff apparently learned this when she reached out to Erica Christmas in an email dated September 13, 2021, asking her why it appeared that she was not being offered sub jobs at those schools. (*See* Doc. No. 45-2 at 63.) According to the same email, however, the plaintiff had already asked Adrienne White in January 2020 why she was being excluded from NEMS and MCMS. (*Id.*)

---

[6] Similarly, her records reflect that she took off September 30, 2019, but the call log indicates that she accepted a job at West Creek High school on that day; her records indicate that she substituted at West Creek Middle School on October 1 2019, but the call log says she accepted a job at New Providence Middle School that day; and her records show that she was at West Creek High School on November 25, 2019 and that a scheduled job at Northeast High School on November 26, 2019 was cancelled so she did not substitute that day, but the call log shows her as accepting a two-day posting at Montgomery Central High School on November 25–26, 2019. (Bunt Decl. ¶ 5; Doc. No. 46-1, at 6.)

[7] Christmas's supplemental Declaration attributes the discrepancies identified by Bunt to the system's documenting that Bunt "accepted" a job if she pressed a "1" to hear details about an assignment, even if she ultimately did not actually accept the assignment. (Christmas Aug. Decl. ¶ 5.) The court finds that, because the plaintiff expressly contends that her claim relating to the system's failure to call her is limited to the eighteen months following the filing of her January 2018 EEOC Charge, evidence regarding her receipt of calls from the system during the timeframe referenced in Christmas's Declarations and spreadsheet (August 2019–March 2021) is not actually relevant.

Erica Christmas responded that the plaintiff was, in fact, excluded from jobs at KHS "per K. Parker," from MCMS "per AP . . . due to language used," from NEMS, for unknown reasons, and from WCHS "per M. Slight" for unknown reasons. (Doc. No. 45-2, at 65.)[8] Christmas also noted that the exclusions from MCMS and NEMS were "a few years old." (*Id.*) She notified Bunt that she would reach out to each of the schools to ask about removal from their exclusion lists and get back to the plaintiff. She later told the plaintiff she was no longer on NEMS's or MCMS's exclusion lists. (*Id.* at 65–66, 69.) The plaintiff denies that assertion, based on her having only substituted once at NEMS since supposedly being taken off the exclusion list, for a specific teacher with whom she has a strong relationship. (Bunt Decl. ¶ 9.)

    *1.   NEMS*

Regarding NEMS, the plaintiff believes she was initially excluded from NEMS by Aimee Hoffman in retaliation for the January 2018 EEOC Charge. (Compl. ¶¶ 44–45; *see also* Bunt Dep. 105–09.) The plaintiff testified that Aimee Hoffman was a teacher at NEMS. Bunt explained Hoffman's exclusion of her as follows:

> There was an incident with Ms. Hoffman who . . . got upset with me in the hallway and started yelling at me and somethings. I was trying to get a student's backpack. The bus was leaving. And there was some, you know, miscommunication there. And then to make a long story short, . . . I asked for the assistant principal, so I could explain what's going on here. Ms. Myers comes down. . . . This was a circumstance where Hs. Hoffman – I asked her what is her name. And she got really upset. She held her badge.
>
> And I was like – so I can know who I'm talking to. That's what stirred it, the way that she was interacting. I don't know if she's having a bad day or what.

(Bunt Dep. 110–11.) Bunt had previously substituted for Hoffman, however, and Hoffman had thanked her for her "great work." (*Id.* at 111.) It is unclear when this event occurred, other than

---

    [8] In addition, the plaintiff was noted as excluded from Northwest High School per her own request. (Doc. No. 45-2. at 65.)

that the plaintiff believes it happened sometime after January 2018 and apparently before October 2019, because she claims to have learned about it in CMCSS's EEOC Position Statement dated October 2, 2019. (Compl. ¶ 44.)[9] The plaintiff has no knowledge that Hoffman, by excluding her from substituting at NEMS, was retaliating against her for the January 2018 EEOC Charge or that Hoffman had any knowledge about that charge. (Bunt Dep. 112.)

  *2. MCMS*

The plaintiff also claims she learned about the MCMS exclusion in October 2019. (Compl. ¶ 44.) Although Christmas reported that Bunt was excluded from MCMS due to "language," the plaintiff denies ever using "foul language" in front of any students. (Bunt Decl. ¶ 8.) The plaintiff also notes that Christmas's explanation seems to contradict a spreadsheet previously provided to the plaintiff (dated 9/12/2019), showing that she had been excluded from MCMS "per M. Izatt. 12/7/18." (*See* Doc. No. 45-2, at 6.) Izatt denies retaliating against Bunt at any time for filing EEOC charges or any other reason. (Izatt Decl. ¶ 8.) There is little other evidence in the record regarding the plaintiff's exclusion from this school

  *3. KHS*

The plaintiff alleges that Keith Parker and James Bailey excluded her from teaching at Kenwood High School ("KHS") in retaliation for her having filed the January 2018 EEOC Charge and/or in connection with her subsequent EEOC charges. (Bunt Dep. 113–15.) Her deposition testimony on this topic is confusing, but she states in her Complaint that she was initially excluded from KSH "based on false allegations made on March 3, 2021," when Parker was principal, and that the plaintiff showed that these allegations were false in her email to Erica Christmas, but "no

---

[9] The exhibit filed by the plaintiff relating to Aimee Hoffman's exclusion of her is dated "12/7/17," suggesting that the event might have occurred before the plaintiff filed the January 2018 EEOC Charge. (*See* Doc. No. 45-2, at 5.)

investigation took place." (Compl. ¶ 56.) Christmas told her in March 2021 that the exclusion was temporary and that they could revisit the issue in August 2021.[10] When Bunt contacted Christmas about the issue in September 2021, however, Christmas told her that the new principal, James Bailey, had elected to extend the exclusion. (*Id.*) In her Complaint and in her Deposition, the plaintiff speculates that Bailey's view of her might have been colored by his being the principal who "took over at Whites Creek High School from Mr. Karl Lang who was the principal that caused Plaintiff's termination in April 2010, after twenty-one years of employment." (*Id.*; *see also* Bunt Dep. 116 ("Bailey? He was like that (indicating) with Karl Lang. He's the one that transitioned. They were there together. They were cohorts together.").) The plaintiff complained that Bailey had purportedly "declined to have [her] come back based on what someone else had said, even though no investigation took place to even back up anything to support them excluding me." (Bunt Dep. 116.)

The plaintiff has no other evidence that her exclusion from KHS was retaliatory, and both Parker and Bailey deny that they had a retaliatory motive. More specifically, in his Declaration, Parker states that he functioned as Principal of KHS from 2019 to 2021. (Doc. No. 42-9, Parker Decl. ¶ 1(a).) At the time, he was not aware that Bunt had filed EEOC charges or a lawsuit against CMCSS and did not become aware of these until he was contacted by attorneys for CMCSS in June 2023. (*Id.* ¶ 3.) Parker states that, in his position as Principal of KHS, he became aware that Bunt "struggled with student relationships," "agitated students," and had been involved in

_____

[10] The plaintiff, among other documents, has filed her single-spaced 15-page "statement," providing her view of the incident that took place at KHS in March 2021 that led to her exclusion from that school at that time, in which she characterizes herself as a victim of the situation involving a student lying about her interaction with him and requests an investigation. (Doc. No. 45-2, at 30–44.) In response to Bunt's statement, Christmas assured her that nothing about the event would be part of her employee file or referenced in any recommendations and that no further action was "being taken against [her] employment with the district." (Doc. No. 45-2, at 45.)

"incidents" in the classroom. (*Id.* ¶ 4(b).) Based on this information, he decided to exclude her from working as a substitute at KHS. (*Id.*) His understanding of the way the system worked was that his decision would not affect Bunt's ability to work as a substitute for CMCSS, because each principal has the discretion to decide whom to allow to substitute at his or her school. (*Id.* ¶ 4(c).) He avers that his decision to exclude her was not in retaliation for filing EEOC charges or a lawsuit or any other reason. (*Id.* ¶ 5.)

Bailey produced a Declaration in which he states that he began working for CMCSS in July 2021 when he was appointed Principal of KHS. (Doc. No. 42-6, Bailey Decl. ¶ 2.) He had previously worked for Metropolitan Nashville Public Schools for many years. (*Id.*) He did not learn that Bunt had filed EEOC charges or a lawsuit alleging retaliation until contacted by CMCSS's lawyers in June 2023. (*Id.* ¶ 3.) He states that, when he became KHS Principal, the KHS Assistant Principals "shared with [him] that there had been prior negative interactions" between Bunt and students in the classroom, based on which the prior administration had determined that she should be excluded from substituting at the school. (*Id.* ¶ 4(b).) Based on the information provided to him by the Assistant Principals who were "familiar with the situation," Bailey decided to "continue to support the earlier request to exclude Ms. Bunt from substitute teaching assignments" at KHS. (*Id.* ¶ 4(c).) He avers that, to his knowledge, there was no retaliation against Bunt for filing EEOC charges or a lawsuit or any other reason and that he himself did not retaliate against her and could not have, as he did not know about her protected activity. (*Id.* ¶ 5.) Bailey likewise attests to his understanding that each principal had the discretion to decide which substitute teachers they wanted at his or her school. (*Id.* ¶ 4(d).)

### 4. WCHS

The plaintiff also claims that she was excluded by Matthew Slight and then by Dr. Damaris Luna from substitute teaching at WCHS in retaliation for the January 2018 EEOC Charge and/or

the subsequent charges. (Compl. ¶ 57; Bunt Dep. 117–19.) Slight attests in his Declaration that he did not know that the plaintiff had filed any EEOC charges or a lawsuit alleging retaliation until he was contacted by attorneys for CMCSS in June 2023, and he denies ever retaliating against the plaintiff for any reason. (Doc. No. 42-10, Slight Decl. ¶¶ 3, 6.)

The plaintiff complained to Erica Christmas and Jeanine Johnson in an email dated September 14, 2021 about her exclusion from both KHS and WCHS, asking why she continued to be excluded, even though the principals who had originally excluded her (Parker and Slight) were no longer at those schools. (Doc. No. 45-2, at 74; Johnson Decl. ¶ 6(a); Doc. No. 42-8, at 9.) Bunt's "take" was that her exclusion by Slight from WCHS must have been in retaliation for her complaining about not being hired for the CE Teacher position in December 2019, which was the subject of her July 2021 EEOC Charge. (Doc. No. 45-2, at 74.) She generally complained that no investigation into the allegations against her was ever conducted and that her exclusion was unfair and retaliatory.

As set forth in her Declaration and exhibits attached thereto, Jeanine Johnson initially responded to Bunt's emailed complaint by sending Bunt an email with links to the forms she could complete to formalize her retaliation complaint against CMCSS. (*Id.* ¶ 6(b).) Although Bunt never completed these forms or provided any additional information, Johnson states that she nonetheless investigated Bunt's concerns by interviewing each of the principals implicated by the plaintiff's complaint, pursuant to CMCSS Policy HUM-P010. (*Id.* ¶ 6(c)–(d); *see also* Doc. No. 43-8, at 4.) The results of this investigation are contained in a memorandum titled "Investigation, Kathleen Bunt, CMCSS Substitute Teacher, Complaint Regarding School Exclusions," dated October 4, 2021. (Doc. No. 42-8, at 9.)

According to Johnson's memorandum, Slight decided in November 2020, when he was then Principal of WCHS, that Bunt should be excluded from substituting at that school based on "concerns" raised by Assistant Principals and allegations that she "argued with students, causing chaos," and did not follow instructions provided by teachers. (Doc. No. 42-8. at 9.) As of the date Johnson interviewed him, September 28, 2021, Slight was no longer WCHS Principal and was instead serving as Director of Social Emotional Learning. (*Id.*)

The plaintiff insists that, at least in September 2021, Slight would have known about the July 2021 EEOC Charge, because it alleged that he had discriminated against her based on age. (Compl. ¶ 58; Bunt Dep. 117–18.) The court notes, however, that Slight's name is not referenced in the July 2021 EEOC Charge. (*See* Doc. No. 1-4, at 8–9.) Moreover, it is clear that Slight's decision to exclude the plaintiff from WCHS was made in 2020 and in effect for the 2020–2021 school year, before the plaintiff filed the July 2021 EEOC Charge. Accordingly, there is no basis from which an inference could be drawn that Slight knew about that charge when he decided to exclude the plaintiff from substituting at WCHS.

Slight was apparently succeeded as WCHS Principal for the 2021–2022 school year by Dr. Damaris Luna, who had previously held the position of Principal of West Creek Middle School ("WCMS"). (*Id.* at 9–10.) Luna allegedly related to Johnson that she had had problems with Bunt when she substituted at WCMS during the 2020–2021 school year, toward the end of the year. Luna told Johnson that, if she had remained as Principal of WCMS, she would have excluded Bunt from substituting at that school for the following year. The types of concerns she expressed included "parent complaint regarding behavior toward student, front desk staff indicated Ms. Bunt would request changes in assignments, other teachers reported Ms. Bunt speaking loudly and rudely to students in the hallway." (*Id.* at 10.) Luna had purportedly moved Bunt around to

different grades, looking for a better fit, but continued to receive complaints. Accordingly, when Luna was transferred to WCHS and informed that Bunt was already excluded from that school, she "made the decision to keep the exclusion in place based on experiences from WCMS." (*Id.*)

Johnson determined, based on her investigation, that the administrators at the two schools had requested Bunt's exclusion based on "interactions she had with students and complaints they received from students, parents, and teachers" and that there was no evidence to support Bunt's allegation that her exclusions were "connected to EEOC complaints she previously filed against CMCSS." (Doc. No. 42-8, at 10.) Johnson also noted that, as Chief Human Resources Officer, she was "aware of the EEOC complaints" but "did not share the existence of them with these school administrators." (*Id.*) She also confirmed that CMCSS General Counsel, Carol Joiner, who was also aware of the EEOC complaints, " did not share the existence of the complaints with these school administrators" and that "Erica Christmas was not aware of the EEOC complaint until March 15, 2021, when she was interviewed by the EEOC investigator regarding Ms. Bunt's second EEOC complaint." (*Id.*)

Christmas and Johnson both attest generally that the principals at each CMCSS school had full discretion as to whom they select to fill substitute teaching positions at their schools (Christmas Decl. ¶ 5(b)) and that the CMCSS HR Department generally does not get involved in the "interviewing and selection of teachers for placement at schools, including substitute teaching positions" (Johnson Decl. ¶ 11).

The plaintiff objects that Johnson's investigation was incomplete, because Bunt was never provided documentation that supported the principals' allegations and never given the opportunity to rebut their allegations. (Bunt Decl. ¶¶ 6–7.) Although she responded to Johnson's email specifically rebutting and objecting to her findings and requesting documentation supporting them

(*see* Doc. No. 45-2, at 76–78), Johnson "functionally ignored" Bunt's objections and never responded to her request for documentation, as a result of which, according to Bunt, the investigation was "entirely one-sided and appeared to totally ignore the issues about which [she] was complaining" (Bunt Dec. ¶ 7). The plaintiff denies the veracity of the allegations against her and insists that she has always maintained a professional demeanor and positive relationships with students. (*Id.* ¶ 8.)

Bunt appealed Johnson's decision to Angela Huff, then CMCSS's Interim Director of Schools. Huff affirmed Johnson's finding that there was no evidence that the plaintiff's exclusion from KHS or WCHS was in retaliation for protected activity. (Doc. No. 42-4, Huff Decl. ¶ 6(g).) Huff's determination was based on her view of Johnson as a "well-experienced human resources investigator" whom she "trusted . . . to conduct a thorough investigation," which appeared to have been done "based on the thoroughness of her report." (*Id.* ¶ 6(h).)

The plaintiff admittedly has no direct evidence of retaliation. (*See generally* Doc. No. 45-1, Resp. to SUMF.) She continues to be employed as a substitute teacher with CMCSS and was recognized at the end of the 2022–2023 school year as one of the longest-serving substitute teachers in the system.

After the plaintiff filed this lawsuit, *pro se*, in December 2021, the court granted in part and denied in part CMCSS's Motion to Dismiss under Rule 12(b)(6), leaving intact only the plaintiff's retaliation claims. Shortly thereafter, counsel from the court's Civil Appointments Panel was appointed to represent the plaintiff. (Doc. No. 20.)

Following discovery, CMCSS filed its Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Material Facts, and, as indicated above, a substantial quantity of evidentiary material in support of its position. (Doc. Nos. 39–42.) The

plaintiff filed a Response in Opposition to the Motion for Summary Judgment, Response to the Statements of Undisputed Material Fact, and additional evidentiary material. (Doc. No. 45 and attached exhibits.) CMCSS filed a Reply. (Doc. No. 46.)

## II.    LEGAL STANDARD—RULE 56

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P.

56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    ANALYSIS

### A.    Legal Standards

CMCSS characterizes the plaintiff's Complaint as asserting two retaliation claims, one based on her having filed the January 2018 EEOC Charge and the other on her having filed the July 2021 EEOC Charge. (*See* Doc. No. 40, at 1–2.) The court finds this characterization somewhat inaccurate, insofar as it overlooks the plaintiff's August 2019 EEOC Charge, which is the charge that initially alleged retaliation for having filed the January 2018 EEOC Charge. Broadly construed, the *pro se* Complaint appears to allege that, after Bunt filed the August 2019 EEOC Charge, she continued to experience retaliation following that charge and through the filing of the July 2021 EEOC Charge.

The record is admittedly confusing, given the number of somewhat overlapping EEOC charges and claims and the fact that this is the second of two lawsuits the plaintiff has pursued in this court. The defendant, however, has not moved for summary judgment on any claim on the basis that the plaintiff failed to exhaust that claim. Moreover, aside from the clearly time-barred claims arising from Matthew Slight's decision not to hire the plaintiff for the CE Teacher position at WCHS in December 2019, which the plaintiff first raised in her July 2021 EEOC Charge (*see* Note 3, *supra*), the defendant does not assert that any of the plaintiff's other claims are barred by the statute of limitations. It is well established now that exhaustion, like the statute of limitations, is not jurisdictional but is instead a waivable defense. *George v. Youngstown State Univ.*, 966 F.3d

446, 469 (6th Cir. 2020); *Adamov v. U.S. Bank Nat. Ass'n*, 726 F.3d 851, 856 (6th Cir. 2013). Consequently, the matter of which EEOC charge encompasses which retaliation claims is basically immaterial. The question is whether the plaintiff suffered retaliation for having engaged in protected activity.

With regard to that question, the plaintiff concedes that she is not in possession of any direct evidence of retaliation and relies instead on indirect evidence. To analyze a retaliation claim based on indirect evidence, the court employs the familiar *McDonnell Douglas* burden-shifting framework. Under this framework, to survive summary judgment, a plaintiff must first establish a *prima facie* case of retaliation. *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 213 (6th Cir. 2021); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). To do so, she must show that she: "(1) 'engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action.'" *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 587 (6th Cir. 2022) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012)). Only if the plaintiff succeeds at this step does "the burden of production shift[] to the defendant to 'offer a non-discriminatory reason for the adverse employment action.'" *Blizzard*, 698 F.3d at 288 (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)).

As relevant here, although the second factor of the *prima facie* case is usually framed in terms of whether the "defendant" knew about the protected activity, the Sixth Circuit has recognized that the plaintiff must produce some evidence that the relevant decision-makers who engaged in the adverse actions knew about the protected activity when they made the actionable decisions. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999); *see also Brown v. City of*

*Franklin*, 430 F. App'x 382, 386 (6th Cir. 2011) ("[O]ne necessary element of the *prima facie* case is that the official committing the adverse action have knowledge of the protected activities." (citing *Barnett v. Dep't of Veterans Affs.*, 153 F.3d 338, 343 (6th Cir. 1998)). Direct evidence of such knowledge is not required; circumstantial evidence may suffice. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). The plaintiff, however, must offer more than speculation and "conspiratorial theories" to establish an inference of knowledge. *Id.*

Regarding the adverse action, the Supreme Court has made clear that the standard is relatively low in the context of retaliation claims. In this context, a plaintiff establishes a materially adverse action when she offers proof that the employer has engaged in some action "that would have been materially adverse to a reasonable employee or job applicant. In the [retaliation] context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. Further, actions that would not be material for purposes of a discrimination claim could rise to the level of an adverse employment action when considered in context, such as a change in the work schedule of a young mother with children in school. *See id.* at 69 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). This is an objective inquiry. *Id.* at 68.

As for causation, at the *prima facie* stage, a plaintiff's burden is "minimal"—requiring only that she "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *A.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) (quoting

*Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). Temporal proximity can "help meet this causal burden," but temporal proximity standing alone will be sufficient to create an inference of a causal connection only when the "adverse action comes 'very close in time' after the exercise of protected activity." *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The Sixth Circuit has subsequently reaffirmed that "[t]emporal proximity alone generally is not sufficient to establish causation" and that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448–49 (6th Cir. 2020) (quoting *Mickey*, 516 F.3d at 525; other citations omitted). In *Kenney*, the plaintiff was fired two and one-half months after complaining about the employer's discriminatory hiring practices. The court held that "temporal proximity is one consideration in assessing whether [the plaintiff] has satisfied her burden to show causation between her complaint and her termination. But a roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation." *Id.* at 449. Thus, the plaintiff was required to "provide other indicia to support a causal connection." *Id.*

### B. The Adverse Actions

In the present case, there is no dispute that the plaintiff engaged in protected activity. CMCSS argues that it is entitled to summary judgment on the plaintiff's retaliation claims, because the plaintiff cannot establish any of the other elements of her *prima facie* case of retaliation. Specifically, with respect to each of the purportedly retaliatory events the plaintiff experienced, CMCSS contends that she cannot establish (1) that the individuals who allegedly engaged in retaliatory acts knew that she had engaged in protected activity; (2) that she was subjected to any materially adverse employment action; and/or (3) that there is a causal connection between the protected activity and the alleged adverse actions.

The plaintiff argues, in response, that she has satisfied the "knowledge" element, because she has shown that there is a material factual dispute as to whether at least "some of these officials," such as Matthew Slight, were aware of Bunt's protected activity when they made adverse employment decisions, and because the HR employees indisputably knew about her charges. (Doc. No. 45, at 9–10.) Bunt likewise argues that each of the items she complains about satisfies the Supreme Court's definition of adverse employment action in the context of retaliation claims. She appears to argue that the totality of all of the actions she has complained about collectively satisfies the requirement, and she also contends that Johnson and Izatt took adverse actions against her when they failed to take her complaints seriously, failed to adequately investigate those complaints, did not follow CMCSS's own procedures, and did not allow her to present evidence, "thereby having a one-sided investigation process." (*Id.* at 10–11.) Finally, Bunt insists that she can show a causal connection between her protected conduct and the adverse actions she suffered "through a combination of temporal proximity and other elements such as demonstrating that she was treated differently from other employees" and that the employer failed to adequately investigate. (*Id.* at 11 (citation omitted).) She also argues, very generally, that summary judgment is not appropriate where an "employer's true reasons" for its actions are "elusive." (*Id.*)[11]

### 1. The Numerous Classroom Observations

The plaintiff asserts that she was subjected to "increased scrutiny" after filing her January 2018 EEOC Charge and that this is precisely the type of adverse employment action that "could

---

[11] The plaintiff here cites *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004), but that case stands for the proposition that, once a plaintiff establishes a *prima facie* case of discrimination or retaliation, summary judgment for the defendant will "ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.'" *Id.* at 565 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 n.8 (1981)). *Singfield*, that is, would only be relevant if the plaintiff succeeds in establishing a *prima facie* case.

well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57.

Regarding the visit by Michael Tharpe immediately after the plaintiff filed her January 2018 EEOC Charge, the very close temporal proximity between these events might be sufficient, standing alone, to give rise to an inference of causation, were it not for the fact that Tharpe has unequivocally testified that he did not know at the time he visited the plaintiff's classroom or wrote up his observation report that she had engaged in protected activity. The plaintiff's speculation that he must have known is not sufficient to call his testimony into question. Moreover, even if there were some basis for inferring his knowledge, a single observation followed by a *positive* evaluation simply would not be the type of action that would dissuade a reasonable employee from complaining about discrimination. This incident does not qualify as an adverse action, even if the plaintiff could establish knowledge and a causal connection.

Regarding the other approximately twenty observations that the plaintiff alleges took place during the 2018–2019 school year, the plaintiff has not presented any concrete evidence regarding who the observing visitors were or why they visited, nor has she shown that these visits hampered her ability to teach, distracted the students, resulted in negative evaluations, or adversely affected any of the terms of her employment or her ability to teach at any of the schools at which the visits occurred. Moreover, even if the court presumes that the observations collectively qualify as an adverse employment action simply by virtue of their number, the plaintiff has not presented any evidence that the visitors had knowledge of her protected activity or that the visits were causally connected to that protected activity. Further, regarding causation, the court further notes that these visits (aside from Tharpe's) started up approximately seven months after Bunt filed the January 2018 EEOC Charge. Thus, the temporal proximity between the observations and the protected

action, standing alone, is not sufficiently close to permit an inference of causation. The plaintiff has not pointed to any other evidence to help carry her burden of proving some causal connection between the events. Finally, the court notes that Johnson, who knew about the EEOC charge, has stated in her Declaration that she did not share that information with any school administrators or principals.

In response to the defendant's evidence that its HR personnel did not communicate the fact that the plaintiff had filed an EEOC charge with any school principals or other administrators and its argument that the plaintiff lacks evidence of the requisite knowledge or, consequently, causation, the plaintiff has the burden of presenting evidence sufficient to create a material factual dispute in order to avoid summary judgment. She simply has not carried that burden with respect to this allegation. The defendant, therefore, is entitled to summary judgment on the retaliation claim arising from the plaintiff's allegations of "increased scrutiny" following the filing of the January 2018 EEOC Charge.

### 2. The Shane Smith Incident

The plaintiff's unpleasant and undoubtedly humiliating encounter with Assistant Principal Shane Smith occurred in May 2019. The plaintiff's version of the incident does not correspond precisely with Smith's, but there is no dispute that the event took place and that the plaintiff felt that she was treated unfairly. Regardless, while Smith's reaction may not have been fair or measured, nothing about the interaction suggests that it was motivated by a desire to retaliate against the plaintiff for her having engaged in protected activity or for any other reason. Shane Smith avers unequivocally in his Declaration that he did not know in May 2019 that the plaintiff had filed an EEOC charge in January 2018. (Smith Decl. ¶ 5.) The plaintiff's perception that Smith was "pleasant" to her before she filed the January 2018 EEOC Charge but "ignore[ed]" her after it, up until the May 2019 incident (Bunt Decl. ¶ 3), does not qualify as circumstantial evidence

either that Smith knew about the charge or that there was a causal connection between that charge and the May 2019 incident that took place nearly 18 months after the plaintiff filed that charge.

In sum, even assuming that this action would qualify as an adverse employment action, there is no evidence of knowledge of protected activity by the decision-maker, Smith, or of a causal connection between the plaintiff's protected activity and this event.

3. *Denial of Interviews for Full-Time Positions in October 2018, March 2019, and June 2019*

The denial of the opportunity to interview for jobs for which she was qualified is objectively the type of adverse action that might well deter a reasonable employee from complaining about retaliation or discrimination. CMCSS has presented evidence that the HR professionals who knew about the EEOC charge did not share it and that the individuals who made the decisions regarding whom to interview for the three jobs at issue did not have knowledge that the plaintiff had engaged in protected activity. The plaintiff, again, has offered no evidence, direct or circumstantial, suggesting that the individuals who made the hiring decisions in those instances knew about her protected activity, nor has she proffered any evidence from which a causal connection between her protected activity and those events could be inferred.

4. *Denial of Long-Term Substitute Job at Northeast High School in Spring 2019*

Likewise, the denial of a particular long-term substitute job qualifies as an adverse employment action for purposes of the plaintiff's retaliation claim. The plaintiff, however, offers nothing but a very vague description of this event and has not affirmatively identified the decision-maker. She seems primarily to be alleging that the HR Department failed to take her complaint seriously or to adequately investigate her complaint.

The record is clear, however, that the HR Department does not get directly involved in the decisions by individual school principals regarding whom they hire for particular jobs, that the HR

Department had not shared the plaintiff's filing of an EEOC charge with any school principals, and that the original explanation given to the plaintiff—that a teacher certified in history was selected for the long-term substitute job—was simply mistaken. The plaintiff cannot point to anything other than speculation and conspiracy theories in support of her contention either that the individuals who chose not to hire her for the particular job knew that she had engaged in protected activity or were motivated by retaliatory intent. The court also finds it notable that the plaintiff was not actually prevented from substituting at that school, as it was only because she was actually substituting at that school that she learned that the person who was selected for the long-term job she wanted was no better qualified than she.

Again, the plaintiff bears the burden of proof. Speculation is not proof, and the defendant is entitled to summary judgment on this claim as well.

### 5. *The Phone System*

The plaintiff's Response expressly limits her claim relating to CMCSS's SmartFind phone notification system's failure to notify her for all available jobs to the time period from January 2018 through August 2019. (Doc. No. 45, at 4; *see also* Doc. No. 45-1, Pl.'s Resp. SUF ¶ 54.) The plaintiff's allegations in her Complaint regarding the phone system's failures are cursory at best. Her primary contention appears to be that she complained repeatedly about the system, but nothing was ever done to ensure that it was working correctly for her and that this was yet another concern that no one took seriously.

Certainly, based on the testimony in her deposition, there appears to be a factual dispute as to whether the system was indeed functioning as it should with respect to calling her for jobs. Melissa Izatt's Declaration states that she examined the SmartFind phone data for the most recent school year (the 2018–2019 school year) and found that it was calling Bunt for jobs and that she had, in fact, been called 210 times that year for substitute jobs and had accepted 153 of the calls.

(Doc. No. 42-11, Izatt Decl. ¶ 3.) The plaintiff testified that she believed Izatt's data to be inaccurate, that "she accepts the majority" of calls coming from the system to her, and that she knows that the system was not calling her about jobs, because she would call into the system herself or log into her computer and see that there were jobs available about which the system had not notified her.

That dispute is not actually material, however. Erica Christmas states in her June 2023 Declaration—and the plaintiff does not refute this portion of her testimony—that the system also employed email notification and that substitute teachers could also use an app on their phones or log into their computers via the "Frontline website" to access jobs and choose their assignments. (Christmas June 2023 Decl. ¶ 5(d).) In other words, it is undisputed that were multiple means by which individuals could discover job postings, and the plaintiff does not allege that any of these other systems was not working for her. She was clearly able to access and select job assignments. Moreover, neither party produced a call log for this time period, nor has either party actually produced a record showing the number of days the plaintiff substituted during that time period. The evidence offered by the plaintiff, in other words, does not establish that she actually suffered any injury resulting from the alleged problems with the phone system, as required to establish an adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

The plaintiff attempts to establish an adverse action when she denies that the system was simply "messing up" (Bunt Dep. 98) and instead insists that some person must have tinkered with the "increase/decrease calling" settings to ensure that she received fewer calls or was somehow lower on the priority list for many schools. (*See id.* ("They have the capability of increasing your

calls and decreasing your calls.").) Decreasing the number of calls the plaintiff received, so that she would see and have the opportunity to accept fewer substitute teaching jobs could certainly qualify as an adverse employment action, except that there is no evidence, as indicated above, that the problem actually adversely affected the plaintiff's ability to learn about jobs. In addition, aside from her own speculation, the plaintiff has no actual evidence that such a nefarious tinkerer exists, who that person is, or what motivated him or her.

Finally, insofar as the plaintiff's claim may be premised on the failure of CMCSS's administrative staff to whom she complained to take this complaint seriously, find out why she was getting fewer calls, and fix it, the evidence in the record suggests that Melissa Izatt did investigate the plaintiff's complaint and determined that it was unfounded.[12]

In sum, the court finds that the plaintiff lacks sufficient evidence of an adverse action by any person, much less one who had knowledge of her protected activity, or that there was a causal connection between such activity and the purported adverse action. The claim premised upon problems with the phone system is without merit.

6. *Being Barred from Substitute Jobs at Specific Schools*

a) *Northeast Middle School and Montgomery Central Middle School*

The evidence in the record regarding the plaintiff's exclusion from these schools is scant, but the court finds that the plaintiff lacks evidence that would establish a causal connection between those exclusions and her protected activity, because there is insufficient evidence as to when exactly these exclusions occurred (except that it was sometime before October 2019) and,

---

[12] Izatt attested in a Declaration filed in connection with Bunt's 2019 lawsuit, also attached as an exhibit to the Declaration filed in this case, that Bunt had previously expressed frustration with the fact that the phone system did not call her after 11:00 p.m. or before 4:30 a.m. and that it had been communicated to Bunt that these times are "outside of the district callout window." (Doc. No. 42-11, at 12.)

therefore, as to whether they could have been premised upon the January 2018 EEOC Charge. With respect to the NEMS exclusion in particular, the plaintiff has no evidence that the individual allegedly responsible for the exclusion, Aimee Hoffman, had knowledge that the plaintiff had engaged in protected activity.

*b)*     *Kenwood High School and West Creek High School*

The two principals who made the initial decisions to exclude the plaintiff and one of the two who chose to extend the exclusion have submitted Declarations in this case explaining why they chose to exclude Bunt from substituting at their schools and also attesting that, at the time they made those decisions, they had no knowledge that the plaintiff had engaged in protected activity and that this would not be information to which they would normally be privy. Johnson has submitted a Declaration stating that she personally interviewed all four of the individuals involved in these decisions and that she explained the results of her investigation to the plaintiff. She attests that neither she nor anyone else, to her knowledge, would have revealed the existence of the plaintiff's EEOC activity to any of the principals involved. (Johnson Decl. ¶¶ 6–9 & Ex. B.) The plaintiff has proffered no evidence, circumstantial or otherwise, to support her conclusion that the principals knew about her protected activity or that her exclusion from their schools must have been based on that activity. The record simply does not substantiate her speculation in that regard.

Again, specifically with respect to Slight, although the plaintiff claims he would have known about the EEOC charge that was specifically addressed to his actions in denying her a job at WCHS in December 2019, that charge (the July 2021 EEOC Charge) (1) does not identify Slight by name and (2) was filed in 2021, *after* Slight made the decision in 2020 to exclude her from WCHS. No possible inference of knowledge or a causal connection arises under these circumstances.

### c) Failure to Conduct Adequate Investigation

Federal law prohibits discrimination and retaliation insofar as they are premised upon a defined and narrow set of protected characteristics and protected activity. These federal laws, however, do not create a generalized rule of fairness and civility in the workplace. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (recognizing that Title VII is not a "general civility code"). The plaintiff's contention that she was treated unfairly and that CMCSS's HR Department failed to adequately investigate her numerous complaints amounts to nothing more than a generalized complaint that she was treated unfairly.

More to the point, the record establishes that Johnson and Izatt (and Christmas) did investigate the plaintiff's complaints, even if not, perhaps, as thoroughly as the plaintiff wanted them to. *Nothing*, however, supports the plaintiff's assertion that she was prevented from telling her side of the story or that her complaints were not taken seriously. She did tell her side of the story, repeatedly and at length. The fact that she was not formally interviewed as part of the investigation process, standing alone, does not render the investigations inadequate. Nor does the plaintiff's disagreement with the conclusions drawn from the investigations make them inadequate. The HR Department employees were not required to accept as true the plaintiff's version of events or even to resolve the discrepancies between the varying versions of events. With respect to the claims at issue here, their only obligation was to consider whether the plaintiff was the victim of discrimination or retaliation as prohibited by federal law.

Even if the plaintiff were able to show that the HR Department was unreasonable in concluding that she had not been subject to retaliation, she offers no support for the suggestion that the HR Department's investigations of her substantive complaints constituted, in and of themselves, adverse employment actions of the type that would prevent a reasonable employee from making or pursuing discrimination or retaliation claims or that the failure to investigate was

somehow causally related to her prior protected activity. That is, the plaintiff has not shown that the investigations that were conducted in response to her complaints in this case were so obviously inadequate or dismissive of the plaintiff's concerns as to qualify as an adverse action.

The court does not "mean to suggest that failure to investigate a complaint cannot ever be considered an adverse employment action for purposes of a retaliation claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 722 (2d Cir. 2010). In *Fincher*, the Second Circuit found that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint," but it noted that a retaliation claim might lie if the alleged failure to investigate was alleged to be "in retaliation for some separate, protected act by the plaintiff." *Id.* Thus, for example, in *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006), the D.C. Circuit found that an employer's alleged failure to investigate a complaint of a death threat against an employee, an FBI agent, contrary to its usual practice and allegedly in retaliation for the same agent's prior complaint of discrimination, was sufficient to state a claim of retaliation under Title VII. *Id.* at 1219–20; *see id.* at 1220 ("[A] reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI in the face of threats against him or his family.").

In this case, however, the court simply finds that the purported failures to investigate were not materially adverse, did not cause the plaintiff separate harm, and were not so objectively deficient that they would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (quoting *Rochon*, 438 F.3d at 1219); *see id.* at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").The mere fact that Bunt disagreed with the outcome of the various

investigations is not the type of "harm" envisioned by *White*. Thus, insofar as the plaintiff premises a retaliation claim on the HR Department's purported failure to adequately investigate her various complaints of retaliation, the claim is without merit.

## IV. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted in its entirety, and this case will be dismissed with prejudice. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge